IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:17CV556-RJC
(3:12CR68-RJC)


JONATHAN DAVEY,                              )
                                             )
                           Petitioner,       )
                                             )
          vs.                                )
                                             )
UNITED STATES OF AMERICA,                    )
                                             )
                           Respondent.       )
_____ )


## GOVERNMENT'S RESPONSE TO PETITIONER'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

Jonathan Davey has moved to vacate, correct, or set aside his sentence

pursuant to 28 U.S.C. § 2255, asserting claims of ineffective assistance of counsel

and prosecutorial misconduct. The United States respectfully requests that this

Court deny the motion because Davey has not shown deficient performance or

prejudice, nor has he shown any misconduct by the government.

## BACKGROUND AND PROCEDURAL HISTORY

### A. Davey conspires to defraud individuals out of money that they believed he would profitably invest.

    1.  Davey creates a hedge fund called Divine Circulation Services, which operates a Ponzi scheme.

In 2007, Davey created a hedge fund called Divine Circulation Services

(DCS). *United States v. Davey*, 661 F. App'x 240 (2016). Most of the fund's

investments were failures.  By February 2009, the only DCS investment that purported to be profitable was a supposed hedge fund called "Black Diamond."  *Id.* at 241-42.  Black Diamond ultimately proved to be a Ponzi scheme.  *Id.*  In February 2009, Keith Simmons, Black Diamond's founder, met with Davey and other Black Diamond investors and told them that a "cash out" was imminent.  Despite representing that all investor money would be returned, there was no cash out, and, shortly thereafter, Black Diamond ceased paying withdrawal requests.  *Id.* at 242.

By late April 2009, all of DCS's business ventures had collapsed, and Davey stopped investing DCS's money in any ventures.  Despite this, he continued to solicit and obtain new funds from investors, which he used to set up his own Ponzi scheme.  *Id.*  Instead of investing the new funds, Davey placed them in a cash account from which he paid himself a management fee, paid for personal expenses (such as a gold Rolex watch), and fulfilled withdrawal requests from earlier investors.  *Id.*

> 2. <u>Davey facilitates the participation of other hedge-fund managers in the Ponzi scheme.</u>

Other hedge fund managers who had invested in Black Diamond created similar cash accounts for depositing new investor funds.  Davey helped facilitate a broader Ponzi scheme by serving, through an entity called "Safe Harbor," as a hedge fund administrator for these accounts.  *Id.*  In return for a monthly management fee, Davey handled the transfer of funds to and from the cash accounts and maintained a website that was accessible to investors and showed false, positive monthly returns.  *Id.*  Additionally, he allowed the other hedge fund managers to

2

tell their investors that Safe Harbor was an independent accounting firm that had vetted the hedge funds, despite the fact that this was not true.  *Id.*  Davey encouraged other hedge-fund managers to use their investors' funds for their own purposes, including to pay Davey's fees.  *See* Doc. No. 274, at 87-91.[1]

"Over time, without any truly profitable investments, the money in DCS dried up."  *Davey*, 661 F. App'x at 243.  Near the end of August 2009, there were $4 million in outstanding withdrawal requests from DCS investors, and Davey stopped accepting new investments.  *Id.*  However, he continued to use money from DCS to pay for his personal expenses, and he continued to publish false returns for other hedge fund managers on Safe Harbor's website, in exchange for management fees. *Id.*  By the end of November 2009, DCS investors had over $6 million in outstanding withdrawal requests.  *Id.*

    3.  <u>Davey uses hundreds of thousands of dollars of investor money to build a new home for himself and disguises those funds as a "loan" through various entities he created.</u>

Davey used funds from DCS to build a 10,000 square foot, $2 million home for himself in Ohio.  Doc. No. 274, at 189-95; Doc. No. 275, at 168.  He set up an entity called "Shiloh Estates," which owned the home.  Doc. No. 274, at 189-95.  He also created an entity called "Sovereign Grace," that purportedly borrowed money from DCS and loaned it to Shiloh Estates to fund the construction of Davey's home.  *Id.* However, the purported loans had no defined interest rate, no lien securing them, no schedule of payments, and no loan agreement or other document reflecting their

---

[1] Unless otherwise indicated, all docket references refer to documents in the underlying criminal proceeding.

terms. *Id.* Moreover, Davey told his brother-in-law that he intended to default on the loans, which he eventually did. *Id.*

Davey identified the payments used for his home as a loan on his 2008 income tax return, which classified an $810,000 payment to Davey as a loan. *Davey*, 661 F. App'x at 242-43. This was the same amount that DCS had paid to Sovereign Grace and that Sovereign Grace had paid to Shiloh Estates in 2008. *Id.* Although Davey's tax preparer expressed concerns about the loan, Davey shouted her down and told her that the loan was legitimate and that he had every right to make it. Doc. No. 275, at 171. If the loan amount had been reported as income, it would have resulted in an additional tax liability of $279,240. Doc. No. 275, at 209.

## B. Davey consents to the freezing of his assets as part of a civil action.

In January 2011, the Commodities Futures Trading Commission (CFTC)[2] filed a civil complaint seeking injunctive relief against Davey and his related companies, including DCS. Complaint, *U.S. Commodities Futures Trading Comm'n v. Simmons*, No. 3:11CV23 (W.D.N.C. Jan. 13, 2011), ECF. No. 1. Davey retained counsel for these proceedings. *See id.*, ECF. No. 52. This Court issued a Statutory Restraining Order that prevented Davey and his related companies from transferring, selling, or disposing of their assets, except as ordered by the Court. *Id.*, ECF No. 47. The parties entered into a consent order by which they agreed to refrain from selling commodities to other people or causing false reports or records

_____

[2] The CFTC is an independent federal regulatory agency that is charged with the administration and enforcement of the Commodity Exchange Act. *Id.*, ECF No. 1, ¶ 18.

4

to be made.  *Id.*, ECF No. 73.  They also agreed that the Statutory Restraining Order remained in full force and effect until further order of the Court.  *Id.*  A later order allowed Davey to receive a salary from Safe Harbor Wealth, Inc., and to access certain reasonable living expenses.  *Id.*, ECF No. 76.

### C. Davey is charged criminally with several conspiracies and willfully attempting to evade income tax, and a jury convicts him of all counts.

In February 2012, a grand jury in the Western District of North Carolina indicted Davey, charging him with:  conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 (Count One); conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (Count Two); conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (Count Three); and tax evasion and aiding and abetting the same in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2 (Count Four). Doc. No. 1.  With respect to the tax evasion count, the government alleged that from August-September 2008, Davey had caused Simmons to transfer $810,000 of victim funds from Black Diamond, in the Western District of North Carolina, to Shiloh's account.  *Id.*, ¶ 123.  Davey then transferred this money back to DCS and used it to make payments for his mansion.  *Id.*, ¶ 124.  The government also charged Davey with lying to agents of the FBI and the IRS, while in the Western District of North Carolina, about the money that he had diverted to his mansion.  *Id.*, ¶ 130.

At Davey's initial appearance and arraignment, he moved for the appointment of counsel.  Dkt. entry of Mar. 22, 2012.  His request was approved,

and attorney Dianne Katherine Jones McVay was appointed to represent Davey. Doc. No. 25.

Prior to trial, the government filed a motion in limine seeking to exclude references to the parallel civil proceedings being pursued by the CFTC as irrelevant and confusing, misleading, and a waste of time. Doc. No. 131. This Court granted the motion. Doc. No. 274, at 61-62, 66-67. However, the Court allowed the government to offer, as an admission against interest, an exhibit in which Davey mentioned the CFTC investigation in a letter to other investors. *Id.* at 67.

One of the exhibits that Davey proposed to offer at trial was his own recording of an October 2009 conference call between Davey and other fund managers. *See* Doc. No. 173, at 2, 5 (Def.'s Proposed Exh. 201). The call was 40-minutes long. The Government objected to this evidence, arguing that these statements were hearsay and were not admissions by a party opponent, because they were being offered by the party himself, and that the statements included references to the CFTC that should be excluded per the government's motion in limine. Doc. No. 173, at 2-3. Defense counsel argued that the recording should be admitted to show the context of the statements that the government was offering in its case in chief. Doc. No. 276, at 28. The Court held that the defendant was not allowed to offer his own hearsay testimony unless there was another rule of evidence that would allow this testimony to be admitted. *Id.* at 30. Accordingly, the Court stated that counsel should identify and submit the portions of the call she

wanted to admit, as well as the basis for such admission, to the Court. *Id.* at 30-31. Counsel ultimately withdrew the request to submit the full recording. *Id.* at 36.

At trial, the government presented testimony from over a dozen witnesses, including Stephen Lacy, a hedge fund manager who had participated in the broader Ponzi scheme; two of Davey's key employees; an IRS investigator; and numerous investors in DCS. *Davey*, 661 F. App'x at 243. The evidence presented at trial showed that Davey intentionally defrauded investors by accepting their money for investment, but instead placing this money in cash accounts, which he raided for his own purposes.

During the trial, Lacy read a portion of an August 4, 2009, email that he had sent to Davey and three other people. Doc. No. 274, at 74-76. In the email, Lacy sought to find out where they were with respect to the paymaster and getting a cash out from Black Diamond. *Id.* at 75. Lacy noted that "this has gotten ridiculous" and that "[a]ny prudent person in our position would probably already be pounding on regulator's desks by now." *Id.* at 76. However, he went on to note that "[i]f this gets taken to the regulatory services, it will absolutely hit us all, and at that point there won't be anymore 'I don't know' or 'It doesn't pertain to me' or 'I'm just not going to answer any questions.'" *Id.* Lacy conceded that he did not approach any regulators because he knew that what he was doing was wrong. *Id.*

On cross-examination, Lacy admitted that after Simmons was arrested, Lacy set up a new company, called "Lincoln Funds, SC." Doc. No. 274, at 108. When asked whether he had taken the "profits" from Black Diamond and transferred

7

them to the website for this new company, Lacy testified, "I don't know. I guess. I don't know." *Id.* Counsel then attempted to refresh Lacy's recollection with a view of his website from January 2010. *Id.* Lacy stated that he did not know what the numbers were derived from and that he had just duplicated the numbers that Davey had reported to him on the prior website. *Id.* at 110.

Lynn Wymer testified that she was a certified public accountant who had worked for Safe Harbor Wealth. Doc. No. 275, at 158-60. In October 2008, Davey asked Wymer to audit some hedge funds that were investing in Black Diamond. *Id.* at 162. Wymer audited St. Croix Partners, reporting that the only recordable transactions were $10,000 in costs for organization and startup and that there was no cash on hand. *Id.* at 164-65. However, when shown a transaction sheet for a St. Croix Partners savings account that reflected a $3.4 million balance as of September 30, 2008, Wymer testified that her audit was not accurate. *Id.* at 166. Wymer testified that she learned that St. Croix Partners had cash in its account the spring following her audit. *Id.* at 167. She spoke with Davey about it, and he told her that he was just "babysitting" the money in his account. *Id.* Wymer testified that this did not seem right to her. *Id.*

William Pultinas, a securities examiner with the Ohio Division of Securities, testified that in April 2009, he examined Davey's firm Safe Harbor Wealth Investments. Doc. No. 275, at 127-28, 135. When Pultinas met with Davey, Davey refused to tell him where his clients' purported $13 million in assets were being

held.  *Id.* at 131-32.  Davey claimed that this was proprietary information that he did not have to reveal.  *Id.* at 132-33.

Tyiesha Nixon, a Special Agent with the Internal Revenue Service, testified that she compared Davey's Quick Book records with bank records and records from other hedge fund manager accounts.  Doc. No. 275, at 182.  She testified that Government Exhibit 2c[3] showed an analysis of deposits and expenditures for March through December 2009.  During this time, almost $1.2 million in investor money came in to DCS, but no transfers were made to Black Diamond.  *Id.* at 183.  During the same period, almost $5 million was taken in by all of the hedge funds for which Davey was serving as a hedge fund manager.  *Id.* at 185.  Nixon also testified that Davey spent almost $600,000 on building his personal residence during this timeframe.  *Id.* at 186-87, 189-90, 192.  According to Nixon, she used the term "Ponzi payments" on the exhibit to reflect new investor money being used to pay old investors.  *Id.* at 187.  Nixon also identified the total investor balance that was posted on Davey's website as having risen from just under $34 million in February 2009, to over $123 million by December of 2009.  *Id.* at 200.

### D. Davey falsely characterizes $810,000 that he spent on building his mansion as a loan in order to evade paying taxes.

When Wymer prepared Davey's 2008 tax return, she characterized the $810,000 that DCS had loaned to Sovereign Grace, which in turn had loaned the money to Shiloh Estates, as a loan because this was how Davey had presented it in

---

[3] The government trial exhibits referenced in this response have been redacted and are attached.  The original numbering of the trial exhibits has not been changed.

his books. Doc. No. 275, at 172. Accordingly to Wymer, she told Davey that his return did not seem right, as he should have been paying more taxes. *Id.* at 171-72.

Nixon reviewed Davey's 2008 tax return and found that he improperly characterized $810,000 as a loan to DCS. *Id.* at 205-06. Sovereign Grace borrowed the funds from DCS and then lent the money to Shiloh Estates, which used the money to build Davey's house. *Id.* at 168-69. However, the funds originated from Black Diamond, the company that Simmons had incorporated in North Carolina. *See* Gov. Exhs. 15a-15c; Doc. No. 276, at 48. William Dixon, a contractor from Cary, North Carolina, testified that he had invested in DCS after Davey's brother told him about the fund. Doc. No. 274, at 112-13. Money that he invested in DCS was used to pay the architect and the builder for Davey's house. *Id.* at 121-23, 197-98. Because Davey took the $810,000 from investors and this amount was not a loan, he owed an additional $279,240 in taxes for 2008. Doc. No. 275, at 209-10.

The jury convicted Davey of all four charges. Doc. No. 174. This Court sentenced him to 252 months of imprisonment, including 60 months of imprisonment for the tax count, 12 months of which was to run consecutively to the other counts. Doc. No. 263. The Court also ordered Davey to pay over $21 million in restitution. *Id.*

### E. On appeal, the Fourth Circuit finds "overwhelming evidence" that Davey and his co-conspirators intentionally misled investors in a variety of ways to obtain more money.

Davey appealed, arguing that this Court had erred in excluding the testimony of witnesses who would have testified that Davey refused to accept DCS

investment money after August 2009, evidence relating to DCS investments other than Black Diamond, and his 2009 tax return, which reported the 2008 "loan" as taxable income in 2009. *Davey*, 661 F. App'x at 243-45. He also argued that there was insufficient evidence to support his conviction for tax evasion and that the restitution order was invalid. *Id.* at 245-46. The Fourth Circuit rejected these arguments and found that "the government introduced at trial overwhelming evidence that [Davey] and his co-conspirators solicited funds by intentionally misleading investors, in multiple ways." *Id.* at 244.

Davey filed the present motion to vacate on September 13, 2017. Civ. Doc. No. 1, at 76.

## **ARGUMENT**

Davey, through his motion to vacate, again attempts to shift blame for his actions to other people and entities. He also attempts to shift the focus of the charges against him to whether he was involved in the Black Diamond Ponzi scheme. In doing so, he ignores the actual basis of the charges against him, namely the derivative Ponzi scheme that he established, as well as the help that he provided to other fund managers to participate in the scheme, particularly after Black Diamond stopped paying out funds. When properly focused, the baseless nature of Davey's claims is readily apparent. Because Davey's claims are without merit, his motion to vacate should be denied.

11

**I.    Davey's claims of ineffective assistance should be denied because he cannot show deficient performance or prejudice.**

Under the Sixth Amendment, criminal defendants have the right to effective assistance of counsel.  U.S. CONST. amend. VI.  To prevail on a § 2255 claim of ineffective assistance of counsel, a petitioner has the burden of establishing both (1) that defense counsel's performance was deficient, in that counsel's "representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms," and (2) that this deficient performance prejudiced the petitioner.  *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).  Courts must apply a "highly deferential" standard in reviewing an attorney's performance and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  To establish prejudice, the petitioner must demonstrate there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different*."  Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  It is not sufficient to show the mere "'possibility of prejudice.'"  *Satcher v. Pruett,* 126 F.3d 561, 572 (4th Cir. 1997) (quoting *Murray v. Carrier,* 477 U.S. 478, 494 (1986)).  In considering the prejudice prong, a court "can only grant relief under . . . *Strickland* if the 'result of the proceeding was fundamentally unfair or unreliable.'"  *Sexton v. French,* 163 F.3d 874, 882 (4th Cir. 1998) (quoting *Lockhart v. Fretwell,* 506 U.S. 364, 369 (1993)).  If a petitioner fails to conclusively demonstrate prejudice, the reviewing court need

12

not consider whether counsel's performance was deficient. *United States v. Terry,* 366 F.3d 312, 315 (4th Cir. 2004).

### A. Appellate counsel was not ineffective for failing to argue for the first time on appeal that the civil freezing of DCS's assets violated Davey's Sixth Amendment rights.

Courts should ordinarily only find ineffective assistance for failure to raise claims on appeal when "ignored issues are clearly stronger than those presented." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (internal citation and quotation omitted). Appellate counsel is not required to assert all non-frivolous issues on appeal. *Griffin v. Aiken*, 775 F.2d 1226, 1235 (4th Cir. 1985). Rather, "it is the hallmark of effective appellate advocacy" to winnow out weaker arguments and to focus on more promising issues. *Smith v. Murray*, 477 U.S. 527, 536 (1986). Thus, "[a] decision with respect to an appeal is entitled to the same presumption that protects sound trial strategy." *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993). Additionally, the petitioner still bears the burden to show that there is a reasonable probability that but for counsel's failure to raise an issue on appeal, the result of the proceeding would have been different, i.e., he would have prevailed on appeal. *See Robbins*, 528 U.S. at 285-86.

While Davey's appeal was pending, the Supreme Court decided *Luis v. United States*, 136 S. Ct. 1083 (2016), which addressed the use of a defendant's untainted property to pay reasonable attorney fees. In *Luis*, the defendant was charged with various offenses relating to healthcare fraud, including having fraudulently obtained almost $45 million. Because she had spent most of this

money, the government sought to preserve the $2 million remaining in Luis's possession pursuant to 18 U.S.C. § 1345. *Id.* at 1087-88. The government moved for a pretrial order to restrain Luis from dissipating her assets, so that the assets could be preserved for paying restitution and other criminal penalties. *Id.* The government obtained an order freezing the assets on the basis that the assets were property of equivalent value, that is, the assets were untainted by the charged offense. *Id.* at 1087. The Supreme Court determined that the defendant had a Sixth Amendment right to use untainted funds "to pay a reasonable fee for the assistance of counsel." *Id.* at 1096.

Davey argues that his appellate counsel provided ineffective assistance by failing to argue, in light of *Luis*, that the freezing of his personal assets and the freezing of corporate assets without a hearing deprived him of his right to counsel in violation of the Sixth Amendment. Civ. Doc. No. 1, at 16-24 (Mot. to Vacate). He contends that he should have been allowed to hire counsel of his choice. Davey refers, in particular, to DCS's allegedly untainted funds that he suggests were sent to Europe to invest in Amkel Corporation during September and October 2008. *Id.* at 17. Davey asserts that these funds "always retained their corporate title and that Davey never once claimed ownership of them." *Id.* He also contends that he should have been allowed to use any potential untainted future earnings to hire defense counsel. *Id.* at 24.

Davey cannot show that his appellate counsel's performance was deficient or that he was prejudiced. First, McVay did not represent Davey in the civil

proceedings that froze his assets. Second, Davey admits that he did not own the DCS funds and that they "retained their corporate title." *Id.* at 17. Accordingly, he cannot show that any restraint of these corporate assets deprived him of the right to retain counsel on his personal behalf.[4] And he cannot seek relief for DCS under § 2255. *See* § 2255 (providing a remedy for prisoners "in custody under sentence of a court"). Third, Davey agreed to the freezing of assets as part of the Consent Order that this Court entered in the civil action. *See Simmons,* No. 3:11CV23, ECF. No. 73. Fourth, his bald assertion that the funds were untainted is false. The funds held by DCS in Europe also were tainted. *See* Gov. Exhs. 48a, 49b, 49c (showing diversion of funds from victim to DCS Euro and from DCS Euro to Shilo). Davey, himself, argued before the CFTC that DCS invested $4 million in Amkel in October 2008 and that over $3.3 million of that money came from DCS's investment with Black Diamond. *Simmons*, No. 3:11CV23, ECF No. 81, at 4. Because the assets in a hedge fund are pooled, the funds are not separated, *see* Doc. No. 276, at 279-80, so any contention that the funds from DCS and Black Diamond were not tainted is without merit. There is "no right to use illegally obtained funds to hire an attorney." *United States v. Johnson*, 683 F. App'x 241, 250 (4th Cir. 2017), *cert. denied*, 2017 WL 2909214 (Nov. 6, 2017); *see Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 630-31 (1989) (rejecting the argument that the

---

[4] In fact, Davey argued that the funds should be returned to DCS's shareholders. *Simmons*, No. 3:11CV23, ECF No. 81. The CFTC argued that the funds should be frozen because most of the money invested in Amkel by DCS came from Black Diamond. *Id.*, ECF. No. 88. This Court found that the funds should be frozen because they were part of DCS's assets and currently belonged to DCS, not its shareholders. *Id.*, ECF No. 90.

proceeds of a crime may be used to pay for an expensive defense). Accordingly,

Davey cannot show deficient performance or prejudice because his assets were

frozen in a separate, civil proceeding for which he retained separate counsel; DCS's

assets did not belong to Davey personally; Davey had agreed to the restraint of

these assets; and the assets were not untainted.

Davey also cannot show ineffective assistance of counsel on appeal based on

his hypothetical contention that the civil restraining order prohibited him from

obtaining employment in a new field and using his income for his defense without

obtaining approval from the Court and the CFTC. Mot. to Vacate 23-24. Again,

McVay did not represent him in the civil proceeding. Moreover, because he points

to no new job, source of untainted income, or denial of a request to use funds for

counsel, his contention is speculative and hypothetical. As such, this would not

have presented an actual case or controversy, and counsel cannot be deficient for

failing to raise a nonjusticiable issue. *See* U.S. Const. art. III; *Texas v. United

States*, 523 U.S. 296, 300 (1998) (holding "[a] claim is not ripe for adjudication if it

rests upon contingent future events that may not occur as anticipated, or indeed

may not occur at all") (internal quotation and citation omitted); *Scoggins v. Lee's

Crossing Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013). Because this is not

a proper claim, Davey also cannot show prejudice.

Because Davey has not shown that there was a reasonable probability that he

would have prevailed on appeal, particularly under the plain error standard, had

his appellate counsel raised these claims, the claims should be dismissed. *See*

16

*Robbins*, 528 U.S. at 285-86; *cf. United States v. Jones*, 844 F.3d 636, 639-42 (7th Cir. 2016) (holding, where defendant had not objected to pretrial financial restraint, that district court did not plainly err by entering the pretrial restraining order).

## B. Counsel was not ineffective for failing to challenge venue.

Pursuant to 18 U.S.C. § 3237(a), offenses committed against the United States that are committed in more than one district "may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." Tax evasion is a "continuing offense" within the meaning of § 3237(a). *United States v. Root*, 585 F.3d 145, 156 (3d Cir. 2009). In tax evasion cases, venue is not limited to the district of signing, filing, or preparation of the false tax return. *See United States v. Ohle*, 441 F. App'x 798, 801 (2d Cir. 2011) (holding "[a] tax evasion charge is properly venued wherever a defendant's attempt to evade taxes was begun, continued, or completed"). Venue is appropriate in any district where an attempt to evade took place. Thus, venue may be proper in the district in which a false statement is made to an IRS agent, *United States v. Goodyear*, 649 F.2d 226, 228 (4th Cir. 1981), where the making of false records or the concealment of assets took place, *Beaty v. United States*, 213 F.2d 712, 715-17 (4th Cir. 1954), *vacated and remanded for reconsideration on other grounds*, 348 U.S. 905, (1955), *reaff'd*, 220 F.2d 681 (4th Cir. 1955), or where there was a concealment of assets, *Reynolds v. United States*, 225 F.2d 123, 127-28 (5th Cir. 1955).

Davey contends that counsel should have argued that venue for the tax evasion count was improper because the discussion, preparation, and filing of his

Case 3:17-cv-00556-RJC   Document 4   Filed 11/13/17   Page 17 of 33

tax return occurred in Ohio, and the property for which he used the loan is located in Ohio. Mot. to Vacate 48-52. He asserts that, as alleged, the charge against him was not a continuing offense. *Id.* at 50.

The Indictment properly alleged venue in the Western District of North Carolina, citing Simmons's transfer of Black Diamond funds from the Western District of North Carolina to Shiloh's account, as well as Davey's lying to IRS and FBI agents in the Western District of North Carolina. Indict. ¶¶ 123-24. Therefore, counsel had no basis for moving to dismiss the charge for lack of venue. There also was no basis for counsel to object at trial because adequate evidence of venue was presented since investments in DCS and Black Diamond were used to fund Davey's house—which he classified as a loan to avoid paying taxes on this money. *See* Gov. Exhs. 15a-15c; Doc. No. 275, at 168-69, 275; Doc. No. 276, at 48. Thus, Davey cannot show deficient performance. Davey also cannot show prejudice, because he cannot show that a challenge to venue was reasonably likely to succeed, nor can he show that this ultimately would have changed the result, since he was guilty of the charge, and the charge could have been transferred to a district court in Ohio.

Davey falsely alleges that the tax evasion count charged in the Indictment involved both his 2008 and 2009 tax returns, Mot. to Vacate 52, despite the fact that the Indictment alleges that Davey attempted to evade the assessment of income tax due and owing "for the calendar year 2008," by "filing with the IRS a false 2008 U.S. Individual Income Tax Return." Indict. 23. Thus, his contention that counsel provided ineffective assistance by agreeing that the tax charge only related to his

2008 taxes is baseless. In fact, counsel attempted to question Wymer about Davey's 2009 tax return, but this Court ruled that the 2009 tax activity was not relevant. Doc. No. 275, at 178-80. Therefore, Davey cannot establish deficient performance or prejudice relating to the charge of tax evasion. *See Strickland*, 466 U.S. at 687-88, 694.

### C. Davey's assertion that counsel provided ineffective assistance based on the volume of discovery in the case should be dismissed as conclusory.

Davey asserts that counsel provided ineffective assistance because, due to the sheer volume of discovery, she could not have reviewed it all. Mot. to Vacate 25-26. However, Davey has not shown deficient performance or prejudice. Davey does not identify any documents that counsel should have used in his defense, but did not, nor does he identify any viable defense that counsel could have raised based on such documents. He relies solely on the number of hours that counsel billed, though this figure does not include the hours spent on the case by paralegals, experts, and other volunteers. *See* Civ. Doc. No. 1-2, at 88. Accordingly, this claim should be dismissed as speculative and conclusory. *See United States v. Dyess*, 730 F.3d 354, 359-60 (4th Cir. 2013) (holding it was proper to dismiss § 2255 claims based on vague and conclusory allegations); *Day v. Quarterman*, 566 F.3d 527, 540-41 (5th Cir. 2009) (holding claim of prejudice should be dismissed as conclusory where petitioner did not demonstrate what counsel would have found in discovery, nor did she demonstrate that there was a reasonable probability that discovery of this information "would have altered the outcome at trial"); *cf. Beaver v. Thompson,* 93

F.3d 1186, 1195 (4th Cir.1996) (holding a petitioner must proffer specific information as to what the investigation would have produced).

### D. Counsel's failure to move to admit evidence, which this Court had excluded, was not ineffective assistance.

Davey argues that his attorney sought to introduce the full transcript of his 40-minute October 2009 conference call with other hedge fund managers, but then abandoned this effort after the Court asked her to provide the entire transcript for review. Mot. to Vacate 27-31. He alleges that if the jury had heard the entire call, there is a reasonable probability that it might have concluded that he lacked the fraudulent intent to establish his convictions for conspiracy. *Id.* at 31. He bases this on his continuing contention that "[t]he CFTC's failure to alert Davey and others about BD's fraud fostered the appearance of BD's legitimacy." *Id.* at 28.

Counsel was not deficient for failing to move again for admission of the entire 40-minute call. Davey concedes that the conference call "was replete with discussion about the CFTC investigations." Mot. to Vacate 57. This Court had excluded reference to the CFTC's investigation because it was irrelevant to Davey's intent and actions. Doc. No. 274, at 61-62, 66-67. Additionally, this Court had held that Davey could not admit his own hearsay statements without establishing an exception and an evidentiary basis for their admission. Doc. No. 276, at 30-31. Davey has presented no basis on which counsel might have sought admission of the entire conference call, nor has he made any showing that there is a reasonable probability that this Court would have admitted such evidence, or that this evidence would likely have changed the outcome of the trial. *See Strickland*, 466 U.S. at 694.

Therefore, Davey has not shown deficient performance or prejudice based on counsel's failure to move to admit evidence that this Court had excluded.

Similarly, Davey's contention that counsel should have moved to admit CommunityONE Bank's Deferred Prosecution Agreement into evidence is misplaced. *See* Mot. to Vacate 31. Again attempting to shift blame, Davey contends that this agreement could have been used to counter the allegation that Davey had not properly performed due diligence on Black Diamond because it showed that CommunityONE Bank had not notified Davey of Black Diamond's fraud. *Id.* at 31-32. Any failure of another entity to notify Davey of Black Diamond's fraud was not relevant to whether Davey, himself, had committed fraud by accepting investment money and spending it, rather than investing it. *Cf.* Doc. No. 274, at 66-67. Accordingly, Davey has made no showing that such evidence was admissible, or that counsel's failure to move to admit such evidence prejudiced him. Therefore, Davey has not shown deficient performance or prejudice, and these claims of ineffective assistance of counsel should be dismissed.[5] *See Strickland*, 466 U.S. at 687-88, 694.

### E. Davey's assertion that counsel failed to adequately cross-examine Lacy is without merit.

Davey argues that his counsel should have objected when Lacy read an email that mentioned regulatory action; should have impeached Lacy's testimony that he

---

[5] To the extent Davey attempts to extend the argument that counsel should have tried to introduce evidence of his efforts to conduct due diligence by calling bank officials or officers of Black Diamond, Mot. to Vacate 32, these claims should be dismissed as conclusory and, for the same reasons noted above, without merit. *See Dyess*, 730 F.3d at 359-60.

did not know how Black Diamond's earnings appeared on Lacy's new website; and should have shown that the record established that Lacy took money in after Simmons was arrested. Mot. to Vacate 32-35. Davey also contends that counsel should have questioned Lacy regarding whether Davey was involved in the conspiracy. *Id.* at 35. The record establishes that counsel adequately cross-examined Lacy on all of these issues.

Davey's contention that counsel should have objected to Lacy's testimony that "if this gets taken to regulatory services, it will absolutely hit us all," and requested a mistrial is misplaced. Mot. to Vacate 33. Lacy's testimony did not violate the Court's exclusion of evidence regarding the CFTC investigation. This testimony reflected only Lacy's concern that unspecified regulators might become involved; it did not refer to an actual investigation or parallel proceeding.

On cross-examination, defense counsel was able to get Lacy to admit that after Simmons was arrested, Lacy created a new company and accepted new "investments." Doc. No. 274, at 107, 110. When setting up the website for the new company, Lacy took the numbers from Davey's website and duplicated them on the new website. *Id.* at 108-10. However, Davey was not involved with the new company. *Id.* at 110-11. Thus, counsel was able to draw out the information that Davey claims she failed to establish.

Lacy testified that, shortly after the February 2009 meeting where the fund managers were told that Black Diamond was going to do a cash out, he told Davey not to send any more money to Black Diamond because hedge fund managers had

not received withdrawals from Black Diamond that they had requested. Doc. No. 274, at 44-46. After that point, Lacy continued to take funds but sent them to Davey, who put them in a liquid account and told Lacy that he could use that money for whatever he wanted. *Id.* at 47, 87-90. The website that Davey maintained showed that the investments were making money, when in fact there were no earnings. *Id.* at 47. Given this testimony, counsel's strategic decision not to ask Lacy whether Davey was involved in the conspiracy was not deficient. Nor can Davey show prejudice, where Lacy's testimony showed Davey's participation in the conspiracy.

Although Davey contends that counsel should have objected to the sufficiency of the evidence that a conspiracy existed, Mot. to Vacate 38, 46-47, counsel moved for a judgment of acquittal, but her motion was denied.[6] Doc. No. 275, at 225. Davey's assertion that there was no formal agreement between the alleged co-conspirators misapprehends the proof necessary to establish a conspiracy. Due to the "clandestine and covert" nature of conspiracies, there often is little direct evidence of an agreement to commit a criminal act. *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996). Therefore, circumstantial evidence may be used to establish a conspiracy. *Id.* at 858. And because the dates of the conspiracy are not elements of the offense, Davey's contention that a conspiracy was not shown during certain timeframes alleged in the Indictment also fails. *See United States v.*

---

[6] Davey does not directly challenge the sufficiency of the evidence, and any such attempt would be procedurally barred because he only raised sufficiency of the evidence of the tax evasion count on appeal. *See Bousley v. United States*, 523 U.S. 614, 621-22 (1998).

23

*Kimberlin*, 18 F.3d 1156, 1159 (4th Cir. 1994).   Because there was ample evidence that Davey conspired to solicit funds by intentionally misleading investors, *see Davey*, 661 F. App'x at 244, Davey also cannot show prejudice.

Finally, Davey argues that McVay failed to offer evidence that he hired Norman Jones Enlow & Co. to conduct the hedge funds' annual audits in the summer of 2009 and that the auditors approved of his operation and found no evidence of fraud.  *Id.* at 47.  He contends that this evidence would have supported the argument that he was not involved in a conspiracy and that his "zero audits" were not fraudulent.  *Id.*  The exhibit Davey relies on for this conclusion, Pet'r's Exh. 10, shows that the auditors still had questions and were seeking additional information in November of 2009 for the 2008 audit that was being conducted. Thus, Davey has not shown that there was a clear audit that counsel could have introduced.  Moreover, given that the bank statements and other records show that Black Diamond and DCS were not solvent and that Davey was paying other investors and himself, rather than actually investing the funds entrusted to him, Davey cannot show that there is a reasonable probability that an audit report showing otherwise would likely have changed the result at trial.  Accordingly, Davey's claims of ineffective assistance should be denied.

## II.   Davey's claims of prosecutorial misconduct should be dismissed because there was no improper conduct.

To establish prosecutorial misconduct, a defendant must demonstrate: (1) that the conduct of the prosecutor was improper, and (2) that the improper conduct prejudicially affected his substantial rights so as to deprive him of a fair trial.  *See*

*United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993). Even improper conduct may not affect substantial rights where the evidence of guilt is overwhelming. *See United States v. Williams*, 392 F. App'x 194, 196 (4th Cir. 2010).

### A. The government did not suppress evidence.

Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), the Government has a duty to disclose favorable evidence, including impeachment evidence, that is material to guilt or punishment. Evidence is material if it creates "a 'reasonable probability' of a different result." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

Davey's suppression argument is baseless. He contends that the government "intentionally suppressed the full transcript of the October 2009 conference call." Mot. to Vacate 54. There was no suppression by the government because Davey recorded this call himself and defense counsel attempted to have the entire 40-minute call introduced at trial. *See* Doc. No. 173. "[I]nformation actually known by the defendant falls outside the ambit of the *Brady* rule." *United States v. Roane*, 378 F.3d 382, 402 (4th Cir. 2004). Davey's issue is with the Court's decision to limit the portion of the call presented to the jury, a decision which he is procedurally barred from challenging. *See* Doc. No. 274, at 63, 66; *Bousley,* 523 U.S. at 621-22. Additionally, his contention that the tape would have shown that the co-conspirators did not know of Simmons's fraud misses the mark because, regardless of the fact that Black Diamond was a Ponzi scheme, Davey and his co-conspirators

operated their own Ponzi schemes and defrauded investors by accepting investor funds, which they raided rather than invested.

Davey also asserts that the government failed to disclose its deferred prosecution agreement with CommunityONE Bank. Mot. to Vacate 74-75. He contends that this information would have been probative of whether Davey was aware of Simmons's fraud and that it was exculpatory information that should have been disclosed. Davey's attempt to cast blame on another entity for not notifying him of Black Diamond's misconduct was not relevant to Davey's own conduct. Accordingly, this information was not material or exculpatory. Moreover, the fact of CommunityONE's Deferred Prosecution Agreement was public information. *See, e.g.,* https://www.hcpress.com/news/communityone-bank-agrees-to-pay-400000-in-restitution-to-victims-of-simmons-ponzi-scheme-failed-to-detect-and-report.html (May 23, 2012 article); https://archives.fbi.gov/archives/charlotte/press-releases/2012/ponzi-scheme-mastermind-sentenced-to-50-years-in-prison (May 23, 2012 press release). The government does not violate *Brady* by failing to provide publicly available information to the defense. *See United States v. Infante*, 404 F.3d 376, 386-87 (5th Cir. 2005) (finding no *Brady* violation where case file of co-conspirator was a public record). Because the government did not improperly suppress evidence, these claims of prosecutorial misconduct should be dismissed. *See Kyles*, 514 U.S. at 434.

**B. The government did not present false or misleading evidence.**

The government has a duty not to solicit false testimony, nor to let such testimony go uncorrected. *See United States v. Bartko*, 728 F.3d 327, 335 (4th Cir. 2013). A new trial is warranted only when the admission of such testimony "could have affect[ed] the judgment of the jury." *Id.*

Davey's assertion that the government misled the Court regarding why Davey wanted to reference the CFTC investigation is misplaced. *See* Mot. to Vacate 55-58. The government presented the reasons that it believed that this information should not be admitted. *See* Doc. No. 131. In response, defense counsel explained the reason she wanted to include the CFTC's investigation. Doc. No. 274, at 67. The government's attempt to ensure that only relevant evidence was admitted at trial was not improper, nor did this prejudice Davey, particularly where Davey's reasons for wanting to admit this information were presented to the Court.

Davey also contends that the government violated the Court's ruling and intentionally misled the jury by questioning Lacy about the fact that no one had initiated a regulatory investigation. Mot. to Vacate 58. The prosecutor had Lacy read an August 4, 2009, email that he wrote to other hedge fund managers asking about what was happening with the paymaster for Black Diamond. Doc. No. 274, at 75-76. In the message, Lacy states "Any prudent person in our position would probably already be pounding on regulator's desks by now." *Id.* at 76. The prosecutor then followed up with Lacy, eliciting the fact that he did not pound on a regulator's desk because he knew that what he was doing was wrong. *Id.* This was

Case 3:17-cv-00556-RJC   Document 4   Filed 11/13/17   Page 27 of 33

not an inquiry into the CFTC's parallel investigation, rather this dealt with the co-conspirators' own actions, which indicated their knowledge that the investments were not solvent. Davey's contention that this information was misleading is based on his unsupported assertion that by August 2009, the fund managers did not know of Simmons's fraud, despite the fact that they had stopped investing in Black Diamond several months before. Davey has not shown that it was improper for the prosecution to question whether Lacy knew that what he was doing was wrong.

Davey contends that the government proffered misleading testimony from Pultinas, who testified that Davey refused to answer questions regarding Safe Harbor. Mot. to Vacate 59-60. He contends that although this testimony "did not establish guilt nor was it a link in a chain of events that led to the charged conduct, there was reasonable probability that [Pultinas's] testimony unduly inflamed the jury's passions against Davey." *Id.* at 60. Davey complains that the government did not present additional evidence regarding the Ohio investigation. *Id.* However, the Court had ordered the parties not to inquire regarding parallel proceedings, and the government sought to include Pultinas's testimony simply to show that Davey's refusal to answer questions was material to his knowledge and intent. Doc. No. 275, at 130. Davey's contention that the government misled the Court or the jury by not offering purported exculpatory evidence from the Ohio proceedings is baseless.[7] The evidence presented by the government was accurate, and Davey's

---

[7] In 2010, Davey relinquished his securities license after the Ohio Division of Securities issued a notice of intent to suspend or revoke his license. *See*

contention that the government should have presented irrelevant information from a parallel proceeding would have required the government to violate this Court's order limiting reference to parallel proceedings.

Davey also argues, citing his own beliefs and version of the events, that the government elicited false testimony from Wymer, Lacy, and Nixon. Mot. to Vacate 61-73. Wymer's testimony regarding the zero audit of St. Croix Partners, 1 LP, showed that, based on the document that Davey states he prepared himself, the audit was not accurate because St. Croix Partners, 1 LP, had millions of dollars more in assets than were reflected in the audit. Doc. No. 275, at 163-67, 174; Gov. Exh. 141b; *see* Mot. to Vacate 67. Accordingly, her testimony was accurate. Davey's contention that the prosecutor misled the jury during closing argument, by arguing that Davey falsely represented that Safe Harbor Wealth, Inc., was an independent accountant for the hedge funds that were administered by Safe Harbor Ventures, is meritless. *See* Mot. to Vacate 69; Doc. No. 277, at 21-22; *United States v. Manglitz*, 141 F.3d 1161 (4th Cir. 1998) (unpublished) (during closing argument a prosecutor may argue that the evidence supports an inference that may reasonably be drawn). Davey owned both entities and, as Lacy testified, the relationship was not independent. Doc. No. 274, at 73-74. Even Davey admits that he realized by 2009 he was not independent and hired another CPA firm to handle the audits. Mot. to Vacate 69.

---

https://www.comapps.ohio.gov/secu/secu_apps/FinalOrders/Files/2010/10-072%20Davey%20Termination%20Order.pdf.

Davey's assertion that Nixon's testimony and characterization of DCS distributions to shareholders as "Ponzi payments" was false because there was no evidence that Davey knew of Black Diamond's fraud also is meritless. *See* Mot. to Vacate 70. Nixon testified that between March 2009 and December 2009, Davey solicited investors for DCS, but none of the money received was invested or sent to Black Diamond. Doc. No. 275, at 183 (Gov. Exh. 2c). She explained that the term "Ponzi payment" was used to characterize payments made "to old investors using money from new investors." *Id.* at 187. Because the distributions to shareholders were made from funds derived from other investors, rather than from investment earnings, this description was accurate.[8]

Davey asserts that, although his internal documents support Nixon's assessment of the actual values versus the reported values of DCS, there was no evidence that any investors saw these values, other than his own employees. Mot. to Vacate 71-72. Essentially, he contends that this information was not posted on his website. Nixon testified that she used the information from the client database that Davey turned over to create Government's Exhibit 3b. Doc. No. 275, at 201-02. Doggett testified that he used the website to check his earnings and that he invested more money based on the purported positive returns that the website reflected. Doc. No. 275, at 30-31, 34-35. That this information was available on the

---

[8] Peripherally, Davey attempts, citing Pet'r's Exh. 29, to support his contention that the IRS approved of Safe Harbor Christian Foundation and that this discredits Nixon's trial exhibits. However, this exhibit merely shows that this foundation qualified for tax-exempt status, albeit with "certain deficiencies."

website is the relevant factor, not whether every investor used the website to view his or her returns.

The statements that DCS posted relied on the bogus statements from Black Diamond. Doc. No. 274, at 204-05. Thus, DCS's statements, which relied on false information, also were false. Accordingly, Davey's contention that the prosecutor's statement that the DCS website posted bogus statements was accurate. *See* Doc. No. 277, at 26. Because the government did not present false evidence, Davey's claims of prosecutorial misconduct based on the admission of such evidence, should be dismissed. *See Bartko*, 728 F.3d at 335.

## III.  An evidentiary hearing is not necessary to resolve Davey's claims.

In order to obtain an evidentiary hearing, a petitioner must present some evidence of the claim's merit. "Unsupported, conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing." *Nickerson v. Lee*, 971 F.2d 1125, 1136 (4th Cir. 1992), *overruled on other grounds by Gray v. Netherland*, 518 U.S. 152, 165-66 (1996). A petitioner also may not rely on assertions that are "contradicted by the record, inherently incredible, or [a conclusion] rather than [a] statement[] of fact," to obtain an evidentiary hearing. *Jackson v. United* States, 638 F. Supp. 2d 514, 528 (W.D.N.C. 2009) (internal quotations and citation omitted). Here, Davey's self-serving affidavit and arguments are contradicted by the record. Accordingly, an evidentiary hearing is not necessary to resolve his claims.

31

## <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully requests that this

Court deny Davey's motion.

RESPECTFULLY SUBMITTED this 13th day of November, 2017.

JILL WESTMORELAND ROSE
UNITED STATES ATTORNEY

<u>s/Elizabeth M. Greenough</u>
Elizabeth M. Greenough, N.Y. Bar No. 2667905
Assistant United States Attorney
227 West Trade Street, Suite 1650
Charlotte, NC 28202
Telephone:   704-344-6222
Fax:             704-344-6229
Email: Elizabeth.Greenough@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that I caused to be served a copy of the above response upon the Petitioner by U.S. Mail at the following address:

Jonathan Davey
No. 27328-058
FCI Elkton
Federal Correctional Institution
P.O. Box 10
Lisbon, OH  44432

This 13th day of November, 2017.

s/Elizabeth M. Greenough
Assistant United States Attorney
USAO Charlotte, NC