RECEIVED
Charlotte, NC
FEB - 6 2018
Clerk, US District Court
Western District NC

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil No.: 3:17-cv-00556-RJC
(3:12-cr-00068-RJC)

| | |
|---|---|
| Jonathan Davey | ) |
| Petitioner | ) |
| | ) |
| vs. | ) |
| | ) |
| United States | ) |
| Respondent | ) |

Petitioner's Amended Reply to the Government's Response (Docket #4) Opposing Government's Request to Dismiss And in Response to the Court's Instruction (Docket #7)

The Government has moved to request that this Court deny Davey's Motion to Vacate his sentence claiming that Davey's motion, exhibits, and affidavit are baseless and without merit (Docket #4, Government's Response, page 11). Davey requests that this Court deny the Government's motion because the Government's motion has made considerable concessions to material allegations and has failed to refute significant and multiple instances of prosecutorial misconduct and ineffective assistance of defense counsel.

**ARGUMENT**

Davey's briefs, 300 pages of exhibits, and affidavit presented substantial and irrefutable evidence supporting his arguments that the Government's "overwhelming evidence" was rife with false testimony, false evidence, fabricated events, suppressed evidence and was aided by the woefully ineffective assistance of defense counsel. These all contributed to an unfair trial. Therefore Davey respectfully requests that this Court vacate his sentence and convictions.

## I. The Government Admits Failing to Disclose the Deferred Prosecution Agreement (DPA) of CommunityOne Bank (COB).

The most compelling example of the Government's extreme attempts to manipulate Davey's trial was the *Brady* violation concerning the DPA of Simmons' co-defendant, COB. Even more telling was the fact that the ***same*** prosecution team that prosecuted COB also prosecuted Davey. The Government argued that their failure to disclose the DPA entered into by COB with the US was not a *Brady* violation. (Government Response, p26).

The Government made two arguments. First, they argued that the DPA was not material or exculpatory. *Id*. Second, they argued that the DPA was publicly available to Davey and counsel and therefore the due diligence rule precludes Davey from raising *Brady, Id*. The Government wants the district court to forgive the prosecutors for failing to disclose *Brady* evidence – in the instant case it is the DPA – if Davey or his lawyer knew, or with due diligence could have known, about the DPA.

Davey avers that the withholding of the DPA was material, exculpatory evidence that could have effectively gutted the US case against Davey. The withholding of the DPA denied Davey a *fair trial* in the district court.

**Background Facts:** At Davey's criminal trial in the district court the foundation of the US case against Davey was whether or not Davey had performed proper due diligence on Keith Simmons and his purported Black Diamond forex trading platform. See Davey Criminal Trial Case 3:12-cr-00068-RJC-DSC. "He started with other lies, fundamental lies like due diligence. Told them he had done due diligence. Well, that wasn't true at all. This was a lie. He hadn't any due diligence." Prosecution argument -See *Id*. at Doc. 277 at page 20.

Keith Simmons orchestrated the Black Diamond Ponzi scheme through a single account at COB; the Black Diamond Capital Solutions account. Davey, via his hedge fund Divine Circulation Services, wired his investor funds to that account. See COB Bill of Information Case 3:11-cr-00122-RJC-DSC. "Indeed, from April 23, 2007, until September 10, 2009, Simmons deposited with the Bank a total of $35,071,773 of investor funds into account

2

*12534 and withdrew from the bank over the same time span $35,071,883 from the same account." *Id.* at par 7. Simmons operated in the small town of West Jefferson, North Carolina. "It was well known in the community that Simmons was supposedly investing in the foreign currency exchange market." *Id.* at par 7.C.

COB either turned a blind eye and, or had knowledge of the easily detectable Ponzi scheme; yet the bank did nothing "despite the hundreds of suspicious transactions that took place within one of Simmons' accounts over those two and one-half years, and despite the Bank's computer software repeatedly flagging Simmons' account activity as potentially suspicious." *Id* at par 8.

COB entered into the DPA with the US on April 26, 2011. COB was fined $400,000 and charged with one Count of "failing to maintain an effective anti-money laundering program." See Case 3:11-cr-00122-RJC-DCS. The DPA was signed on behalf of the US by Kurt Meyers and Mark Odulio. *Id.* This is the same prosecution team that prosecuted Davey and every other defendant charged in relation to the Simmons Ponzi scheme.

Davey was charged via a Bill of Indictment ("Bill') on February 22, 2012. Also charged were Toft, Sloat, and Murphy. The Bill also enumerated entities and persons implicated in the Ponzi scheme: Divine Circulation Services, Sovereign Grace, Shiloh Estates, Safe Harbor Wealth, Simmons, Coats, Jordan, Lacy, Muyres, and Scarboro. See Document 1 at Case 3:12-cr-00068-RJC-DSC .

Conspicuous by their absence is any mention of CommunityOne Bank. Also in the Bill, the "Investment Fraud Conspiracy" consists of two parts: A. "Due Diligence and Investment Quality Misrepresentations" and B. "Derivative Ponzi Scheme." *Id.*

Davey was assigned counsel and arraigned on March 27, 2012. *Id,* at Doc 26. A trial date was set for June 2012. Davey's counsel received discovery in April 2012 consisting of 284,901 pages including approx. 20,000 pages of COB discovery. *Id,* at Doc 39. In this instant case, it is notable by its absence that the *DPA was not included in the COB discovery provided to Davey by the same prosecutors who prosecuted COB.*

On 5/15/12 a Superseding Bill of Indictment was filed against conspirator Bryan Coats. Again, continuing a troubling pattern by the same prosecution team, there was no mention of COB's culpability in the Simmons Ponzi scheme. See Document 11 at Case 3:11-cr-00309-RJC .

On 5/30/12 the trial against Davey and co-defendants was postponed. See Case 3:12-cr-00068-RJC-DSC.

On December 8, 2014, CommunityOne Bank, 3:11cr122, was listed as a Co-Defendant in the "Amended Judgment in a Criminal Case". *See US v Keith Franklin Simmons*, Case 3:10-cr-00023-RJC-DCK, Doc 108.

**A. The suppression by the prosecutors of CommunityOne Bank's Deferred Prosecution Agreement was favorable, material and exculpatory evidence which violated Davey's due process to a fair trial.**

To prove a *Brady* violation, a defendant must show the evidence at issue meets three critical elements. First, the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v Greene,* 527 U.S. 263, 281 (1999). Second, it "must have been suppressed by the State, either willfully or inadvertently." *Strickler,* 527 U.S. at 282. Third, the evidence must have been material such that prejudice resulted from its suppression. *Id.* The "touchstone of materiality is a 'reasonable probability' of a different result." *Kyles v Whitley*, 514 U.S. 419, 434 (1995). Materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal... [Rather], [a] 'reasonable probability' of a different result is…shown when the Government's evidentiary suppression undermines confidence in the outcome of trial." *Id.*

Davey testified at his criminal trial that his due diligence concerning his investment of client funds in the Black Diamond forex trading program consisted of the following: a) long discussion in winter of 2007 with Bryan Coats, someone he trusted and who said he had good experiences with Simmons, see Doc 276 page 122; b) discussions with Simmons in Winter of 2008, research into Simmons personnel, and document review, See 3:12-cr-00068-RJC-DSC Doc 276 at pages 128-130; Davey's due diligence didn't end once he made his first investment in December 2007. Learning more about a trader and *monitoring red flags* over time is an on-going

task that continues as long as one holds the investment. To be sure, in 2008, there was not publicly available information on forex traders, as compared to a company trading on a public stock exchange. Secondly, the traders themselves were reluctant to reveal their trading strategies for fear of imitation. This opaque nature of traders' 'black boxes' led to many otherwise prudent investors being caught up in an explosion of Ponzi schemes since Madoff became a public figure. Davey, throughout 2008, continued to make Black Diamond redemption requests on behalf of his clients. Davey was receiving statements indicating growing trading profits. Davey saw no red flags since every payout was promptly processed.

Testimony of Simmons employee Jennifer Dowell, Simmons Trial transcript Case 3:10-cr-00023-RJC-DCK, DOC 86, page 102-103:

> Dowell: "The Divine Circulation was a hedge fund. You know, they were [sic] investors. Then we would send them what their withdrawals and they [sic] also, you know, send in deposits."
> Odulio: "What about deposits? How would investors get their funds to Black Diamond?"
> Dowell: "They would wire them in, wire them to CommunityOne Bank."
> Odulio: "Okay. And how would you be informed of an incoming wire?"
> Dowell: "Sometimes, you know, they would tell me that they sent a wire. Then I would always get a wire receipt from the bank."
> Odulio: "Okay. After receiving the wire receipt, what steps did you take at Black Diamond?"
> Dowell: "I would put in on their spreadsheet. Then that would go into their file."
> Odulio: "Okay. About the wire transfers going out, Ms. Dowell, who had the last say in those wire transfers?"
> Dowell. "Keith. He would always call the bank and confirm before anything could be sent out."
> Odulio: "And who was the what was the main bank account you dealt with during the time you were there?"
> Dowell: "The Black Diamond Capital Solutions."
> Odulio: "And what financial institution was that at?"
> Dowell: "It was CommunityOne."

Davey, after seeing zero red flags, requested a $3.3 million dollar payout in October 2008. It was promptly processed. See Case 3:12-cr-00068, DOC 276, Page 133. It is precisely when payouts are delayed, as occurred here in 2009, that a red flag alerts the diligent investor that there could be problems.

5

COB was not some outside or third party entity that Davey was attempting to shift blame to as the Government claims. See Government Response at page 26. The bank was a co-conspirator, without whose participation the fraud could not occur. At no point in the Simmons' trial was testimony proffered about the DPA that the bank entered into with the Government. Exculpatory evidence need not show defendant's innocence conclusively. Under *Brady*, "[e]xculpatory evidence includes material that goes to the heart of the defendant's guilt or innocence…" *Giglio v United States*, 405 U.S.150,154 (1972).

In conclusion, the withheld DPA was favorable, exculpatory, and material because it would have undercut the Government's main argument at trial that Davey was not diligent. The materiality of COB's withheld DPA vis a vis Davey's due diligence can be aptly summed up by the prosecution at Davey's criminal trial; "Again, that *bank records* showed that these Ponzi payments were made. Why are they important? Well they do a couple of things. Number one, they keep the scheme going. They promote it. They keep it moving forward. What else do they do? They conceal it. **They conceal from the folks, *e.g., Davey*, who are receiving these monies, *e.g., Davey*, the true nature of it. So, no one who gets this money understands, or is told that, Hey, this is a Ponzi scheme. Instead they, *e.g., Davey*, are lied to that this money is purportedly returns on their investment."** See Case 3:12-cr-00068-RJC-DSC, DOC 277, page 26.

**B. The Government's reliance on the due diligence rule to justify not disclosing the Brady evidence, *the DPA*, is misplaced.**

At page 26 of Doc 4 of the Government's Response (Case 3:17-cv-00556-RJC), the Government argues that the DPA was public information—pointing to two press releases on the internet on May 23, 2012.

6

The Government then cites to a 5th circuit case – *United States v Infante*, 404 F.3d 376, 386-87 (5th Circuit 2005) for the proposition that there is no *Brady* violation if the DPA was public information or if the case of a co-conspirator was a public record.

In *Infante*, Mr. Infante, along with 4 co-conspirators, were charged in an indictment with conspiracy stemming from the *same incident* that formed part of the conspiracy case against Infante. The 5th circuit decided that there was no *Brady* violation for a failure to disclose favorable information: "We cannot agree *that there is a Brady violation*, especially when the *case* file pertains to an alleged co-conspirator and the charges against the co-conspirator are so closely related to the conspiracy with which the defendant is charged." *Infante* at 385.

In contrast to *Infante*, the *Brady* evidence, *CommunityOne's DPA*, was not disclosed to Davey in the Bill of Indictment vs Davey. The incident that formed the case *against* COB was from the bank's participation with Simmons in the Ponzi scheme.

Davey had no idea of the existence of the DPA vs CommunityOne. He was indicted in February of 2012; arraigned on 3/27/12; 280,000 pages of discovery was dumped on his counsel in April 2012 as she was preparing for a June 2012 court date. Coat's Superseding Bill of Information was filed on May 15, 2012 with no mention of COB. The witness testimony at Simmons trial in December 2010 revealed no mention of any COB culpability. *Supra* Background Facts.

It would be completely unreasonable for Davey or his counsel to be scavenging the internet for hints of undisclosed *Brady* material when they are in the middle of reviewing discovery in May 2012. This burden shifting is what the US Supreme Court has guarded against.

In *Wilson v Beard,* 589 F.3d 651, 663-664 (3rd Cir 2009), the court got it right regarding the prosecutor's duty to disclose a public document. "**.. the fact that a criminal record *COB DPA* is a public document cannot absolve the prosecutor of her responsibility to provide that record to defense counsel.**"

7

In 1995, the US Supreme Court explained the duty to disclose exculpatory evidence: "[T]he prosecution, which alone can know what is *undisclosed*, must be assigned the consequent responsibility to gauge the likely net effect of all [favorable] evidence and *make disclosure* when the point of 'reasonable probability' is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the Government's behalf.... But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith*), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."* Kyles, 514 U.S. at 437-438.

By ignoring *Kyles* instruction that prosecutors must disclose evidence they know is favorable, the Government is attempting to unreasonably apply clearly established federal law.

The 4th circuit has focused, in interpreting the due diligence rule, on what the *defendant himself* knew and could have told his lawyer in determining whether the defendant or his lawyer had exercised reasonable diligence in finding favorable evidence. See *Fullwood v Lee*, 290 F.3d. 663, 686 (4th Cir 2002).

**C. The United States Supreme Court has never recognized an *affirmative due diligence duty* of defense counsel as part of *Brady*, let alone an exception to the mandate of *Brady* as this would clearly be.**

This is precisely why the Government could not cite to a U.S. Supreme Court case to support their argument that there is a public record doctrine that mitigates against the affirmative duty of the prosecutors to disclose publicly available *Brady* evidence, *the DPA*.

The duty to disclose under *Brady* is absolute—it does not depend on defense counsel's actions. *United State v Augurs*, 427 U.S. 97, 107 (1976) ("[I]f the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise if no request is made.") *Brady's* mandate and its progeny are entirely focused on prosecutorial disclosure, not defense counsel's diligence.

This instant case gives the district court an opportunity to clarify the 4th circuit's position: the concept of due

diligence plays no role in the *Brady* analysis.

The factual evidence of this issue supports the following statements in Davey's affidavit:
#14,15,40,41,44,49,50,57,100,101,114

Because the Government committed a material *Brady* violation, Davey requests that this Court deny the Government's motion to dismiss.

## II. The Government Concedes to Using the False Evidence of a Non-existent Website.

The material fact that the Government ignores in their response is that no website actually existed. Therefore, the testimony of Government witness Tiesha Nixon and the evidence on her Government Exhibit #3 Graph were both false. (Government's Response 30-31).

Nixon spent multiple pages of trial transcript testifying that Davey was posting massive fraudulent numbers on his website. (Motion to Vacate 70-71). Three separate times Nixon specifically testified that these numbers were "published to his website" (Trial Transcript, Docket #275, p200, L12-18; p202, L5; p218, L17-19). The Government can neither deny Nixon's false testimony nor produce this alleged website. McVay was ineffective because she refused to impeach Nixon with the one simple question that Davey was urging her to ask Nixon: "Would you please show me the website?"

Davey's claim of prosecutorial misconduct and ineffective assistance of counsel was neither speculative or conclusory and this Court should deny the Government's motion to dismiss.

The Government also stated that Davey's affidavit was self serving and contradicted by the record. (Government's Response 31). But the Government has now conceded that statement #73, 99, & 113 of Davey's affidavit are correct and Nixon's statements are false. Davey requests that this Court order the Government to answer each statement of his affidavit with an admission or denial as to its accuracy. By factually answering each statement, the Government's false accusations and false narrative will be exposed and their case will not support Davey's

9

conviction.

**III. The Government has been Forced to Admit that a Major Fraud Allegation was Baseless.**

The Government has changed their allegation from "Davey *created* bogus statements" to "Davey *relied* on bogus statements". (Government's Response 31). This significant change by the Government materially eliminates the fraudulent nature of Davey's actions and guts his alleged role in the derivative ponzi scheme.

Every investor, including Davey, was deceived by Simmons because they relied on Black Diamond's (BD) false statements. But that is not fraudulent activity. The fraudulent activity is creating a statement with fraudulent earnings when there are no earnings. "Fraudulent intent is not presumed or assumed; it is personal and not imputed...One who acts with honest intention is not chargeable with fraudulent intent." *US v Engelmann* (CA 8th, 2013), 720 F.3d 1005,1008. The Government now admits that Davey did not create any false statements.

Davey's indictment (Document #1 on criminal docket) repeatedly stated that Davey generated false statements (paragraphs 78,80,85,92,94,96,99,103,106, and 110). Under cross-examination, Nixon specifically attributed the false statements to Davey instead of to Black Diamond even though McVay attempted to correct Nixon's testimony (Doc.# 275, p218, L20 - p219, L8). The Prosecutor further emphasized that Davey created bogus statements in his closing argument (Doc.# 277, p27, L3-4). "Due process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact." *Hamric v Bailey* (CA 4th, 1967), 386 F.2d 390,394.

Further, McVay exemplified deficient performance during cross examination by only asking Nixon four questions concerning her testimony about the bogus statements. McVay further failed in her adversarial testing for not using Davey's standard monthly reconciliation of Lacy's hedge fund that Davey had specifically annotated for the jury's benefit in understanding how Davey reported monthly results (Motion to Vacate, Exhibit #28). This reconciliation would have been probative for the jury to see how Davey reconciled Lacy's Wachovia bank statement, PFG Best currency account statements, and BD statements and accurately attributed the resulting losses and earnings to each

10

hedge fund member. McVay could have shown that Davey never created anything but rather reported exactly what the statements reflected. McVay failed to use the opportunity and available resources to correct the Government's allegation of fraud and Davey was prejudiced by her failure because the Government continued to state that Davey created false statements during the trial.

The factual evidence of this issue supports the following statements in Davey's affidavit: 42,43,51,61-66,75,113.

Because the Government conceded that Davey did not create false statements, they have conceded that the indictment presented false charges, Nixon presented false testimony, and the Prosecutor lied about Davey's actions. This major retraction supports Davey's claim of innocence and there is a very reasonable probability that the jury may have reached a different result. Davey requests that this Court deny the Government's motion to dismiss.

**IV. The Government Concedes that Lacy's Testimony was False.**

The Government attempts to usurp factual events with Lacy's false testimony (Government's Response 28). "The Due Process Clause obliges the Government not to knowingly use false evidence, including false testimony, to obtain a tainted conviction." *Napue v Illinois*, 360 US 264,269. Lacy's false testimony, regardless of its purpose, was known to be false by the Government but was allowed to go uncorrected in order to manipulate the jury.

Further, the prosecution's effective suppression of any reference to the actual ongoing parallel investigation by the CFTC effectively eliminated defense counsel's ability to cross-examine Lacy's perjury statements because proving Lacy's perjuries required discussing the CFTC's actions. Citing *Davis v Alaska*, the Supreme Court ruled "the denial of the right of effective cross-examination was constitutional error of the first magnitude requiring automatic reversal." *US v Bagley*, 473 US 667,674.

As already explained and supported by exhibits in Davey's Motion to Vacate, Lacy lied about the existence of an actual ongoing investigation by a US Regulator and also lied about Davey's participation with the ongoing investigation. The Government relied on Lacy's testimony concerning an email Lacy wrote to mislead the jury

11

that no investigation was in process. However, the Government not only knew about the investigation but had suppressed all references about it.

Thus, the Government used knowingly false testimony to support their argument that Davey knew BD was insolvent (Government's Response 27-28). Further, the Government argues that McVay had adequate opportunity to question Lacy about this issue (Government's Response 22). But this argument is irrelevant because the Government cites no case law supporting their position that the adversarial questioning process exempts the Government from the prohibition of proffering false testimony from their witnesses.

The factual evidence of this issue supports the following statements in Davey's affidavit: 31-38,52,55,58,59,67-72,97,110.

Because the Government used knowingly false testimony, Davey requests this Court to deny the Government's motion to dismiss his claims.

### V. The Government Fails to Refute that Davey's "Zero-Audit" was Accurate.

The Government has not provided any accredited evidence that Davey's "zero audit" was inaccurate (Government's Response 29). No bank account or other legal document was presented at trial or referenced in the Government's Reply brief supporting Wymer's testimony that St. Croix Partners I LP (SCP1LP) had millions of dollars in assets at the time of the zero audit. Per *Napue*, the Government cannot elicit false testimony that is known to be false in order to support an allegation. As explained by Davey (Motion to Vacate 66-69), the unaccredited document that the Prosecutor used to elicit Wymer's false testimony was created by Davey *after* the audit was completed. Additionally, this unaccredited document did *not* impugn SCP1LP's zero audit. Further, the Government fails to see the flaw in their position. Utilizing an unaccredited document for audit purposes would have resulted in the suspension of the auditor's license by the Ohio State Board of Accountancy.

The Government also failed to respond to the contradiction of their accusation. A false audit *inflates* assets yet the Government has already admitted that Davey did not do this. (Motion to Vacate 68).

12

The Government stated that "during closing argument a prosecutor may argue that the evidence supports an inference that may be reasonably drawn." (Government's Response 29). The Prosecutor stated in his closing argument that Davey was not independent when he performed these audits (Doc. #277, p21-22). However, Wymer testified to the Grand Jury that she had contacted the American Institute of Certified Public Accountants, discussed the zero audit, and received approval *before* the zero audit was performed (see Motion to Vacate, Exhibit #25). Therefore, the evidence supports Davey's independence. Further, Davey organized the annual audits, which are different than an initial zero audit, to be performed by other independent auditors. (Government's Response 29; see also Motion to Vacate, Exhibit #10). The accurate inference of this evidence points to Davey's innocence because Davey began organizing these annual audits long *before* the alleged derivative ponzi scheme allegedly began.

McVay's failure to adversarially question Wymer effectively, her failure to expose the prosecutor's false evidence, and her refusal of Davey's request to inspect the proffered Government evidence exhibited a deficient performance. The false evidence and testimony prejudiced Davey and undermined the confidence in the trial's outcome. (Government's Response 12).

The factual evidence of these issues supports the following statements in Davey's affidavit: 22-30,98,112.

Because the Government proffered false testimony and evidence, and mischaracterized the evidence in their closing argument, and because McVay was ineffective, Davey requests this Court to deny the Government's motion to dismiss his claims.

**VI. The Government Concedes to Omitting Exculpatory Evidence Which is a *Brady* Violation.**

The Government contended that Government witness William Pultinas did not omit exculpatory evidence. (Government's Response 28-29). The Court had forbidden discussion of parallel investigations but the Government, fully aware of the exculpatory investigation by the Ohio Division of Securities (OHDS), chose anyway to have Pultinas discuss his audit (which itself is an investigation) of Davey's firm which directly

13

triggered the extensive investigation by the OHDS.

Pultinas was obviously upset when he left Davey's office. The Government wanted the Court to hear Pultinas' negative characterization of Davey stating that "[Pultinas] would expose what [Davey] was doing." (Doc. 275,p130,L6-9) However, Pultinas' characterization would have been rendered moot if Davey would have been allowed to show the exculpatory results of the broader investigation.

The Government wants this Court to accept that Pultinas, who twice denied knowing anything about the subsequent investigation, was not aware that his sole recommendation triggered the subsequent investigation. (Doc. 275,p135, L20-25)

Further, the Government downplays the nexus between the OHDS audit investigation and the broader OHDS investigation and claims the omitted result of the broader investigation was "irrelevant" (Government's Response 29). But the omitted evidence was exculpatory and directly contradicted Pultinas' testimony. The Government's omission of this exculpatory evidence was a *Brady* violation. The Supreme Court held that "if the omitted evidence creates a reasonable doubt of guilt that did not otherwise exist, constitutional error has been committed." *US v Agurs*, 427 US 97,112. Further, "Impeachment evidence, however, as well as exculpatory evidence falls within the *Brady* rule." *US v Bagley*, 473 US 667,676. Therefore, "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review." *Kyles v Whitely*, 514 US 419,435.

The factual evidence of this issue supports the following statements in Davey's affidavit: #78. Because of this *Brady* violation, Davey requests that this Court deny the Government's motion to dismiss.

**VII. Davey's Defense Counsel was Ineffective.**

The deficient performance and resulting prejudice by McVay was obvious throughout Davey's trail and multiple examples along with exhibits were provided in his Motion to Vacate as well as this motion. The Government

14

contends that McVay was not ineffective. (Government's Response 16,19,20,21,22,23,24).

A primary example of McVay's rampant ineffectiveness is highlighted concerning the material exculpatory evidence of a 40-minute phone call that Davey recorded. In this instant case - the tape of the recorded call - Davey does not have to overcome the presumption that McVay's failure to provide the Court with the tape was a sound trial strategy. Encompassing multiple pages of transcript, McVay, herself, emphatically argued for the inclusion of this evidence and the Judge, who wisely began to grasp the potential relevance and admissibility of the evidence, specifically requested to review this evidence (Motion to Vacate 29). Inexplicably, McVay balked at the Judge's request and never presented the evidence she had fought so hard to introduce.

There is simply no reasonable explanation for a defense counsel to aggressively pursue a trial strategy and then pivot away, at the last moment, and refuse to present exculpatory evidence when she has finally persuaded the Court of its relevance. Even more peculiar was McVay's failure to inform Davey of her 180-degree pivot.

The Government stated that McVay was "not deficient for failing to move again for the tape's admission" because the Court had excluded references to the CFTC which could be heard on the tape. (Government's Response 20). However, the Government ignores the fact that the Judge specifically requested to review the tape. The Court was willing to make its own determination per the rules of evidence. Yet the Government misses this point by only focusing on the Judge's initial determination. (Government's Response 25).

The Government then states that Davey has not made any showing that there is a reasonable probability that this Court would have admitted such evidence (Government's Response 20). It is true that McVay displayed an extremely weak grasp of the case (because she failed to review all of the discovery and was not provided the resources to handle such a complex case) because she argued for approximately 20 pages of transcript without listing the relevant and admissible issues contained on the tape. However, in Davey's Motion to Vacate, Davey showed that the tape contained three inconsistencies in the Government's case (Motion to Vacate 27) and six claims of innocence (Motion to Vacate 28). Further, the hearsay rule was not a hindrance to admissibility because

15

Government witness Lacy, who was heard throughout the tape, actually testified about some of the tape's contents. "Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment...is simply to ensure that criminal defendants receive a fair trial." *Strickland v Washington*, 466 US 668,689.

When the Government attempted to defend their suppression of the exculpatory tape, they admitted that Mcvay attempted to introduce the tape (Government's Response 25). The Government then states that since the information was known by defendant that there was no *Brady* violation. (Government's Response 25). But once again, the Government's argument is antithetical to the Supreme Court's precedent that "suppression of material evidence justifies a new trial". *Giglio v US*, 405 US 150,154.

The factual evidence of this issue supports the following statements on Davey's affidavit: 31,34-41,52,54,55,58,95,96,97,109,110.

Because the evidence supports McVay's ineffectiveness, Davey requests the Court to deny the Government's motion to dismiss.

**VIII. The Government's Arguments Supporting Tax Evasion Venue are Meritless.**

The issue of venue was so important to our Founders that the defendant's protection of venue is cited twice in the US Constitution (Motion to Vacate 47). Yet the Government cites no Supreme Court cases supporting their position, nor are their arguments supported in the record either.

The Government provides three tests for establishing venue: the district in which a false statement is made to an IRS agent, where the making of false records or the concealment of assets took place, or where there was a concealment of assets. (Government's Response 17). But the Government fails *all* three tests. No evidence has been provided that Davey met with any IRS agent in North Carolina and made a false statement, nor did any agent testify to such a meeting. Nor was any evidence of false records created in North Carolina presented at trial. Finally, the asset in question, Davey's property, was located in Ohio, not North Carolina.

16

The Government then cites the source of funds in the Western District of North Carolina as their basis for establishing venue (Government's Response 18). However, this exact *same* argument was *presented* and **rejected** by the Supreme Court in *US v Cabrales* (1998), 524 US 1,8. (For more on *Cabrales*, see Motion to Vacate 49.)

Further, the physical conduct of Davey's alleged tax evasion was conducted and completed in Ohio in 2009 and the Supreme Court emphasized that venue must be *narrowly* construed. *US v Jefferson* (CA 4th, 2011), 674 F. 3d 332,365 referencing *US v Johnson*, 323 US 273.276.

**Conclusion**

The Government stated that "in order to obtain an evidentiary hearing, a petitioner must present some evidence of the claim's merits." (Government's Response 31). In addition to 300 pages of exhibits attached to his Motion to Vacate, Davey has irrefutably proven that the Government committed significant *Brady* rule violations, presented false testimony and evidence, and admitted to an erroneous allegation of fraud which gutted their theory of the case. Davey further presented numerous examples of deficient defense counsel performance that resulted in prejudice.

Because Davey's motions have presented a pattern of prosecutorial misconduct and ineffective assistance of counsel, Davey requests this Court to deny the Government's motion to dismiss Davey's claims. Because of the Government's constitutional violations, Davey further requests this Court to vacate his sentence and convictions. Davey also requests an evidentiary hearing if the Court needs further evidence or to resolve conflicting testimony.

17

Case 3:17-cv-00556-RJC   Document 8   Filed 02/06/18   Page 17 of 18

Respectfully Submitted on 2/2/2018

_____
Jonathan Davey, pro se
Petitioner
FCI Elkton, Ohio
Reg#: 27328-058
PO Box 10
Lisbon, OH 44432

***CERTIFICATE OF SERVICE***

_____

Jonathan Davey, on this day February 2, 2018 did place this Motion in the prison mailing system, postage prepaid, for delivery to the following address:

Clerk of Courts
401 W. Trade Street
Clerk Room 210
Charlotte, NC 28202

_____
Jonathan Davey, pro se

18