United States District Court
For the Western District of North Carolina
Charlotte Division
Civil No. 3:17-cv-00556-RJC
(3:12-cr-00068-RJC-DCK-1)

| Jonathan Davey, | ) | FILED |
| Petitioner | ) | CHARLOTTE, NC |
| | ) | |
| vs. | ) | MAR 22 2021 |
| | ) | |
| United States | ) | US DISTRICT COURT WESTERN DISTRICT OF NC |

Davey's Reply Addendum to Government's Response of his
2255 Motion to Vacate, Set Aside, or Correct Sentence

**I. The Government Admitted in Their Reply that They Failed to Turn Over the Favorable and Exculpatory Community One Bank Deferred Prosecution Agreement. (Doc.#4, p26)**

What differentiated Simmons' Black Diamond (BD) ponzi scheme from others was the active participation of Simmons' own bank, Community One Bank (COB), in the fraud. In April 2011, the Government filed a Bill of Information against Community One Bank, N.A., of Asheboro, North Carolina. COB was accused of violating the Bank Secrecy Act by failing to notify authorities of Keith Simmons' activity despite COB's internal systems repeatedly flagging Simmons' account for suspicious activity. COB allowed Simmons to launder $35 million of investor funds and failed to notify law enforcement, regulatory agencies, Davey, or other investors and hedge funds that sent their monies to Black Diamond Capital Solutions (BD) for investing in Forex trading. That same month, COB signed a Deferred Prosecution Agreement (DPA) expressly agreeing to accept responsibility for the factual allegations of the criminal information filed. COB also agreed to neither contest or contradict the facts set forth in the criminal information. (see Exhibit #35 of initial brief)

COB's participation in Simmons' money laundering was not disclosed by the Government in the voluminous files provided to Davey's defense counsel, Dianne McVay, even though everyone prosecuted in the BD scheme were prosecuted by the same United States Attorneys, Kurt Meyers and Mark Odulio. Since *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court has reiterated the same three factors to establishing a *Brady* violation: a) The suppressed evidence is favorable to the defendant, b) it was suppressed by the state either willingly or inadvertently, and c) the evidence is material to guilt or sentencing. The Government's failure to disclose the evidence of a major co-conspirator who participated with Simmons longer than any other co-conspirator, who had the clearest picture of BD's entire operation, who expressly confessed to

its conspiratorial role, and who would have corroborated Davey's innocence claim satisfies all three *Brady* factors.

The *Brady* rule is not rule of discovery but rather one of fundamental fairness and due process. The *Brady* rule imposes an affirmative duty on the prosecutor to produce evidence that is materially favorable to the accused. See *United States v. Agurs*, 427 U.S. 97, 110 (1976). Further, the prosecutor must disclose information that is inconsistent with any element of any crime charged or that establishes a recognized affirmative defense regardless of whether the prosecutor believes such information will make a difference between conviction or acquittal.

The Government attempts to explain away their *Brady* rule violation by pointing to two news articles in the Charlotte newspaper on May, 23, 2012, as proof of public notification. The Government then blames McVay of ineffectiveness for not searching for additional co-conspirators not mentioned in Davey's indictment. While Davey agrees with the Government that McVay provided ineffective assistance-of-counsel, McVay could not, in this situation, be reasonably expected to search for additional co-conspirators beyond what the Government identified in Davey's civil and criminal actions relating to BD or beyond the massive 317,000 pages of discovery.

The Government also attempts to support their argument with a 2005 case from the 5th Circuit, *United States v. Infante*. However, the details of the *Infante* case bear no resemblance to the interactions of Davey and COB. In *Infante*, the defendant had knowledge of his co-conspirator's actions, the defendant and the co-conspirator were in communication before his trial, and the co-conspirator actually testified at the defendant's trial. In Davey's case, Davey did not know anything about COB's role in perpetuating BD's fraud, nor did Davey discuss BD with COB, nor did any COB official testify at Davey's trial. It is no wonder that this case has never been referenced by the 4th CA.

A more relevant case for this court to consider is *Fullwood v. Lee*, 290 F.3d 663, 686 (4th CA, 2002), which has been referenced by the 4th CA approximately fifty times. In *Fullwood*, the Court made clear that *Brady* material involved evidence not known by the defendant or available for his use. The Government did not disclose the DPA and the Government did not disclose COB's role in Davey's indictment. In *Davidson v. United States*, 2013 U.S. Dist. 54670 (WD VA, 4/16/13), *Fullwood* was quoted by the Court holding that, "information that is not merely available to the defendant but is actually known by the defendant would fall outside of the *Brady* rule." Therefore, the Government's suppression of COB's role in BD was a *Brady* rule violation.

COB explicitly agreed in their DPA that for two and one-half years they ignored the fact that millions and millions of dollars were coming into BD's COB account and Simmons was spending it for his own purposes. Yet COB never once alerted Davey that Simmons was spending the monies sent to him rather than investing those funds in Forex trading.

Simmons lived in a small town and it was no secret that Simmons' was involved in Forex

2

trading. COB knew that the purpose of Davey sending any monies to BD was for investment purposes because every wire transaction from Davey to COB listed the hedge fund and/or investor to whom the funds belonged. And each wire transfer from COB back to Davey was executed by Simmons calling key personnel at COB's West Jefferson branch and identifying the hedge fund or investor for whom the funds belonged. By virtue of its substantial and material assistance to Simmons, COB was aware of its role in Simmons' fraudulent activity and acted knowingly in assisting Simmons.

No other co-conspirator participated in Simmons' BD ponzi scheme longer than COB. Additionally, COB was the only co-conspirator who had complete access to see exactly what was transpiring in BD's account. COB had the ability to view each transaction and trace the flow of monies in to and out of BD's account. The fact that COB officials intentionally ignored warning flags and intentionally failed to file required notifications is incredible. Even more incredible was the fact that no COB officials were held criminally liable or required to pay any restitution for the $35 million that COB allowed Simmons to launder. And the most incredible of all was the fact that the Government successfully concealed all of this evidence from Davey and claimed that this information was neither material or exculpatory to him.

### II. COB's Participation in BD was Material, Favorable, and Exculpatory to Davey and Would Have Been the Cornerstone of His Defense.

The Government indicted Davey of being a co-conspirator with Simmons in February 2012. In the indictment, the Government listed Davey's co-conspirators. Davey was also aware of an additional co-conspirator, DeAnna Salazar, from the CFTC's earlier civil suit and her subsequent criminal plea agreement. Davey was not aware of any other alleged co-conspirators. In addition to Davey's convictions, Davey was ordered to pay restitution for all of the funds that Davey directed to BD.

Beginning in December 2007 and continuing over the next seventeen months, Davey personally sent to COB approximately $6 million of his investor's funds and more than $10 million of additional investor funds from other hedge funds and investors. Davey further accounted for approximately $7 million indirectly sent to COB. COB also sent back to Davey approximately $13 million during this same time frame. All of Davey's actions were consistent with his claim that he believed in the legitimacy of BD's monthly earnings statements that Simmons was sending him each month and which showed that Davey's investments had grown to over $30 million by the end of 2009. Davey meticulously and accurately allocated BD's investment gains to each of his shareholders.

With the exception of Keith Simmons, all of Davey's known co-conspirators accepted plea agreements. Therefore, Davey knew of no third-party witnesses available to corroborate his testimony that he was not in a conspiracy with Simmons and did not know of BD's fraud. Had Davey known of COB's DPA, he could have had COB officials testify on his behalf, providing credible third-party testimony consistent with COB's DPA, that Davey did not know of Simmons' fraud nor was a part of BD's conspiracy. Rather, testimony would have shown that Simmons

3

and COB had deceived Davey into believing that BD's investment program was successful. COB officials' testimony that Davey had sent millions of dollars for BD to invest would have been inconsistent with the fundamental charges of the Government's case. There is a reasonable probability that the jury would have seen the fallacy of the Government's accusations. Why would Davey send millions of investor's funds to Simmons for Simmons' own personal use? COB officials, who saw every transaction in BD's account, would have testified that Davey received no benefit from sending investor funds to BD. Thus, COB's testimony would have corroborated Davey's claim that he was not in a conspiracy or knew of BD's fraud.

Further, Davey was prevented from showing an alleged co-conspirator (COB) actively and intentionally working with another co-conspirator (Simmons) in deceiving another alleged co-conspirator (Davey). This would have given the jury substantial proof that Davey was not part of the Black Diamond ponzi scheme conspiracy. Additionally, since COB continued to maintain Simmons' account during the so-called "derivative" ponzi period in 2009, Davey could have shown that the lies and deception of Simmons and COB continued up to December 2009 and prevented Davey from becoming aware that his $30 million BD investment was worthless.

## Conclusion

The same US Attorneys in Charlotte, who prosecuted COB for concealing Simmons' fraud, concealed COB's fraud. Davey's initial brief, exhibits, and affidavit presented substantial and irrefutable evidence supporting his seven arguments that the Government's "overwhelming evidence" was rife with false testimony and evidence, fabricated events, and woefully ineffective assistance of defense counsel. But the Government's failure to disclose COB's DPA is the "smoking gun" that evidenced their suppression of favorable material and exculpatory evidence.

The jury was prevented from learning that COB was aware of Simmons' fraud but intentionally chose to deceive Davey. COB's testimony would have shown that Davey had no idea that COB was acting and participating in the fraud by making Davey's withdrawal requests from BD appear to be profits from the Forex trading platform. Thus, the jury was prevented from hearing valuable material and exculpatory testimony that would have been consistent with Davey's claim of innocence.

In summary, if the material fact of COB's money laundering role in the Black Diamond Capital Solutions account transactions had been available and known to Davey's counsel, it would have been the cornerstone of his defense at trial that no red flags were seen by him from December 2007 through June 2009 because the bank provided cover for Simmons' Forex fraud. There does not exist any emails or other communications between Simmons and Davey that show any knowledge by Davey of the fraud - and none were presented at his trail. Therefore, there is a reasonable probability that the *Brady* rule violation affected the jury's verdict. Davey was denied due process and for these reasons the Court should vacate Davey's sentence and convictions.

Respectfully Submitted,

*[signature: Jonathan Davey]*

Jonathan Davey, Pro Se
Reg. #: 27328-058
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

I certify that this brief was put in the prison mail system on ___3/15/21___ to the following address:

Clerk of Courts
Dist. Ct. Clerk Room 210
401 W. Trade Street
Charlotte, NC 28202

5

Case 3:17-cv-00556-RJC   Document 17   Filed 03/22/21   Page 5 of 5