IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:17CV556-RJC
(3:12CR68-RJC)


| | |
|---|---|
| JONATHAN DAVEY, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |
| _____ | ) |


## GOVERNMENT'S SUPPLEMENTAL RESPONSE TO PETITIONER'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

Jonathan Davey has moved to vacate, correct, or set aside his sentence pursuant to 28 U.S.C. § 2255, asserting claims of ineffective assistance of counsel and prosecutorial misconduct. The United States respectfully requests that this Court deny the motion because Davey has not shown deficient performance or prejudice, and his claims of prosecutorial misconduct are procedurally barred and without merit. The Court should also dismiss the new claims Davey has attempted to add in supplemental filings as untimely, procedurally barred, and without merit. And the Court should deny Davey's motions for recusal, discovery, and release pending determination of his claims. The record conclusively shows that Davey's claims are without merit.

**A. Davey conspires to defraud individuals out of money that they believed he would profitably invest.**

    1. Davey creates a hedge fund called Divine Circulation Services, which operates a Ponzi scheme.

In 2007, Davey created a hedge fund called Divine Circulation Services (DCS). *United States v. Davey*, 661 F. App'x 240 (2016). Most of the fund's investments were failures. By February 2009, the only DCS investment that purported to be profitable was a supposed hedge fund called "Black Diamond." *Id.* at 241-42. Black Diamond ultimately proved to be a Ponzi scheme. *Id.* In February 2009, Keith Simmons, Black Diamond's founder, met with Davey and other Black Diamond investors and told them that a "cash out" was imminent. Despite representing that all investor money would be returned, there was no cash out, and, shortly thereafter, Black Diamond ceased paying withdrawal requests. *Id.* at 242.

By late April 2009, all of DCS's business ventures had collapsed, and Davey stopped investing DCS's money in any ventures. Despite this, he continued to solicit and obtain new funds from investors, which he used to set up his own Ponzi scheme. *Id.* Instead of investing the new funds, Davey placed them in a cash account from which he paid himself a management fee, paid for personal expenses (such as a gold Rolex watch), and fulfilled withdrawal requests from earlier investors. *Id.* "In addition to misrepresenting that DCS investors' money actually would be invested, [Davey] made a number of other false statements in order to obtain, or retain, investor funds. For instance, . . . he falsely suggested to another

2

investor that his organization had developed and was using successful currency trading software." *Id.*

### 2. Davey facilitates the participation of other hedge-fund managers in the Ponzi scheme.

Other hedge fund managers who had invested in Black Diamond created similar cash accounts for depositing new investor funds. Davey helped facilitate a broader Ponzi scheme by serving, through an entity called "Safe Harbor," as a hedge fund administrator for these accounts. *Id.* In return for a monthly management fee, Davey handled the transfer of funds to and from the cash accounts and maintained a website that was accessible to investors and showed false, positive monthly returns. *Id.* Additionally, he allowed the other hedge fund managers to tell their investors that Safe Harbor was an independent accounting firm that had vetted the hedge funds, despite the fact that this was not true. *Id.* Davey encouraged other hedge-fund managers to use their investors' funds for their own purposes, including to pay Davey's fees. *See* Doc. No. 274, at 87-91.[1]

"Over time, without any truly profitable investments, the money in DCS dried up." *Davey*, 661 F. App'x at 243. Near the end of August 2009, there were $4 million in outstanding withdrawal requests from DCS investors, and Davey stopped accepting new investments. *Id.* However, he continued to use money from DCS to pay for his personal expenses, and he continued to publish false returns for other hedge fund managers on Safe Harbor's website, in exchange for management fees.

---

[1] Unless otherwise indicated, all docket references refer to documents in the underlying criminal proceeding.

Case 3:17-cv-00556-RJC   Document 19   Filed 03/30/21   Page 3 of 50

*Id.* By the end of November 2009, DCS investors had over $6 million in outstanding withdrawal requests. *Id.*

### 3. Davey uses hundreds of thousands of dollars of investor money to build a new home for himself and disguises those funds as a "loan" through various entities he created.

Davey used funds from DCS to build a 10,000 square foot, $2 million home for himself in Ohio. Doc. No. 274, at 189-95; Doc. No. 275, at 168. He set up an entity called "Shiloh Estates," which owned the home. Doc. No. 274, at 189-95. He also created an entity called "Sovereign Grace," that purportedly borrowed money from DCS and loaned it to Shiloh Estates to fund the construction of Davey's home. *Id.* However, the purported loans had no defined interest rate, no lien securing them, no schedule of payments, and no loan agreement or other document reflecting their terms. *Id.* Moreover, Davey told his brother-in-law that he intended to default on the loans, which he eventually did. *Id.*

Davey identified the payments used for his home as a loan on his 2008 income tax return, which classified an $810,000 payment to Davey as a loan. *Davey*, 661 F. App'x at 242-43. This was the same amount that DCS had paid to Sovereign Grace and that Sovereign Grace had paid to Shiloh Estates in 2008. *Id.* Although Davey's tax preparer expressed concerns about the loan, Davey shouted her down and told her that the loan was legitimate and that he had every right to make it. Doc. No. 275, at 171. If the loan amount had been reported as income, it would have resulted in an additional tax liability of $279,240. Doc. No. 275, at 209.

4

**B. Davey consents to the freezing of his assets as part of a civil action.**

In January 2011, the Commodities Futures Trading Commission (CFTC)[2] filed a civil complaint seeking injunctive relief against Davey and his related companies, including DCS. Complaint, *U.S. Commodities Futures Trading Comm'n v. Simmons*, No. 3:11CV23 (W.D.N.C. Jan. 13, 2011), ECF. No. 1. Davey retained counsel for these proceedings. *See id.*, ECF. No. 52. This Court issued a Statutory Restraining Order that prevented Davey and his related companies from transferring, selling, or disposing of their assets, except as ordered by the Court. *Id.*, ECF No. 47. The parties entered into a consent order by which they agreed to refrain from selling commodities to other people or causing false reports or records to be made. *Id.*, ECF No. 73. They also agreed that the Statutory Restraining Order remained in full force and effect until further order of the Court. *Id.* A later order allowed Davey to receive a salary from Safe Harbor Wealth, Inc., and to access certain reasonable living expenses. *Id.*, ECF No. 76.

**C. Davey is charged criminally with several conspiracies and willfully attempting to evade income tax, and a jury convicts him of all counts.**

In February 2012, a grand jury in the Western District of North Carolina indicted Davey, charging him with: conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 (Count One); conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (Count Two); conspiracy to commit money laundering

_____

[2] The CFTC is an independent federal regulatory agency that is charged with the administration and enforcement of the Commodity Exchange Act. *Id.*, ECF No. 1, ¶ 18.

in violation of 18 U.S.C. § 1956(h) (Count Three); and tax evasion and aiding and abetting the same in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2 (Count Four). Doc. No. 1. With respect to the tax evasion count, the government alleged that from August-September 2008, Davey had caused Simmons to transfer $810,000 of victim funds from Black Diamond, in the Western District of North Carolina, to Shiloh's account. *Id.*, ¶ 123. Davey then transferred this money back to DCS and used it to make payments for his mansion. *Id.*, ¶ 124. The government also charged Davey with lying to agents of the FBI and the IRS, while in the Western District of North Carolina, about the money that he had diverted to his mansion. *Id.*, ¶ 130.

At Davey's initial appearance and arraignment, he moved for the appointment of counsel. Dkt. entry of Mar. 22, 2012. His request was approved, and attorney Dianne Katherine Jones McVay was appointed to represent Davey. Doc. No. 25.

Prior to trial, the government filed a motion in limine seeking to exclude references to the parallel civil proceedings being pursued by the CFTC as irrelevant and confusing, misleading, and a waste of time. Doc. No. 131. This Court granted the motion. Doc. No. 274, at 61-62, 66-67. However, the Court allowed the government to offer, as an admission against interest, an exhibit in which Davey mentioned the CFTC investigation in a letter to other investors. *Id.* at 62, 67. The Court determined that this was relevant as an apparent attempt to lull investors into passivity. *Id.* at 62.

One of the exhibits that Davey proposed to offer at trial was his own recording of an October 2009 conference call between Davey and other fund managers. *See* Doc. No. 173, at 2, 5 (Def.'s Proposed Exh. 201). The call was 40-minutes long. The Government objected to this evidence, arguing that these statements were hearsay and were not admissions by a party opponent, because they were being offered by the party himself, and that the statements included references to the CFTC that should be excluded per the government's motion in limine. Doc. No. 173, at 2-3. Defense counsel argued that the recording should be admitted to show the context of the statements that the government was offering in its case in chief. Doc. No. 276, at 28. When the issue was first raised at trial, defense counsel also suggested that information regarding the CFTC was relevant because the hedge fund managers relied on the CFTC "with regard to not doing anything." Doc. No. 274, at 65, 67. The Court determined that that was not a relevant line of inquiry. *Id.* at 65. The Court also held that the defendant was not allowed to offer his own hearsay testimony unless there was another rule of evidence that would allow this testimony to be admitted. Doc. No. 276, at 30. Accordingly, the Court stated that counsel should identify and submit the portions of the call she wanted to admit, as well as the basis for such admission, to the Court. *Id.* at 30-31. Counsel ultimately withdrew the request to submit the full recording. *Id.* at 36.

At trial, the government presented testimony from over a dozen witnesses, including Stephen Lacy, a hedge fund manager who had participated in the broader

Ponzi scheme; two of Davey's key employees; an IRS investigator; and numerous investors in DCS. *Davey*, 661 F. App'x at 243. The evidence presented at trial showed that Davey intentionally defrauded investors by accepting their money for investment, but instead placing this money in cash accounts, which he raided for his own purposes. As the government made abundantly clear at trial, Davey "was not charged with creating the Ponzi scheme with Keith Simmons." *See* Doc. No. 277, at 60. Rather, he was charged with lying about doing due diligence with respect to Simmons and creating a derivative Ponzi scheme when Black Diamond collapsed. *Id.*

During the trial, William Dixon testified that Davey sent him a document describing DCS as a company that "will engage in the business of investing company assets through participation in the Mex-Bank Currency Exchange Program and other Forex programs that meet our objectives," as well as in Audience Alliance Motion Pictures Studios. Doc. No. 274, at 116-17. The offering document stated, "The company intends to use the entire amount of the stock sale to purchase investments in the areas previously specified." *Id.* at 119. Davey sent Dixon the document around March 2009, when Dixon invested in DCS. *Id.* at 118. But prior to that time Mex-Bank had failed, and Audience Alliance had failed to make an annuity payment. Doc. No. 274, at 173. Dixon invested $200,000 with DCS, but his money was put in a liquid account, rather than being invested as described in the document. *Id.* at 120-24. Money from the liquid account was used to make various payments that did not benefit Dixon, such as over $123,000 that was paid for work

8

on Davey's new home. *Id.* at 121-22. Another investor, Raymond Moore, testified regarding his investments with Davey through both his business and personal accounts, including the difficulties he had attempting to withdraw funds from his accounts beginning in the spring of 2009 and the various representations Davey made to him as to why he could not obtain his money right away. *See id.* at 131-59. Immediately after two investors sent $250,000 to DCS on May 27, 2009, DCS sent Moore about $94,000 for his business withdrawal request. *Id.* at 147-48.

Lacey testified that he met Davey in 2008 and understood that Davey was a Certified Public Accountant and had done substantial due diligence on Black Diamond. Doc. No. 274, at 55–56. During an October 2009 telephone conference, however, Davey admitted that there was nothing as an accountant that he could verify. *Id.* at 70-71; *see* Gov. trial exh. 108b. Lacy testified that he engaged in a derivative Ponzi scheme with Davey and others, in which investor money was put into cash accounts, that Davey posted investor information to his website, and that the information on the website was not accurate. Doc. No. 274, at 45-53. Lacy read a portion of an August 4, 2009, email that he had sent to Davey and three other people. Doc. No. 274, at 74-76. In the email, Lacy sought to find out where they were with respect to the paymaster and getting a cash out from Black Diamond. *Id.* at 75. Lacy noted that "this has gotten ridiculous" and that "[a]ny prudent person in our position would probably already be pounding on regulator's desks by now." *Id.* at 76. However, he went on to note that "[i]f this gets taken to the regulatory services, it will absolutely hit us all, and at that point there won't be anymore 'I

don't know' or 'It doesn't pertain to me' or 'I'm just not going to answer any questions.'" *Id.* Lacy conceded that he did not approach any regulators because he knew that what he was doing was wrong. *Id.*

On cross-examination, Lacy admitted that after Simmons was arrested, Lacy set up a new company, called "Lincoln Funds, SC." Doc. No. 274, at 108. When asked whether he had taken the "profits" from Black Diamond and transferred them to the website for this new company, Lacy testified, "I don't know. I guess. I don't know." *Id.* Counsel then attempted to refresh Lacy's recollection with a view of his website from January 2010. *Id.* Lacy stated that he did not know what the numbers were derived from and that he had just duplicated the numbers that Davey had reported to him on the prior website. *Id.* at 110.

Lynn Wymer testified that she was a certified public accountant who had worked for Safe Harbor Wealth. Doc. No. 275, at 158-60. In October 2008, Davey asked Wymer to audit some hedge funds that were investing in Black Diamond. *Id.* at 162. Wymer audited St. Croix Partners, reporting that the only recordable transactions were $10,000 in costs for organization and startup and that there was no cash on hand. *Id.* at 164-65. However, when shown a transaction sheet for a St. Croix Partners savings account that reflected a $3.4 million balance as of September 30, 2008, Wymer testified that her audit was not accurate. *Id.* at 166. Wymer testified that she learned that St. Croix Partners had cash in its account the spring following her audit. *Id.* at 167. She spoke with Davey about it, and he told

her that he was just "babysitting" the money in his account. *Id.* Wymer testified that this did not seem right to her. *Id.*

William Pultinas, a securities examiner with the Ohio Division of Securities, testified that in April 2009, he examined Davey's firm Safe Harbor Wealth Investments. Doc. No. 275, at 127-28, 135. When Pultinas met with Davey, Davey refused to tell him where his clients' purported $13 million in assets were being held. *Id.* at 131-32. Davey claimed that this was proprietary information that he did not have to reveal. *Id.* at 132-33.

Tyiesha Nixon, a Special Agent with the Internal Revenue Service, testified that she compared Davey's Quick Book records with bank records and records from other hedge fund manager accounts. Doc. No. 275, at 182. She testified that Government Exhibit 2c[3] showed an analysis of deposits and expenditures for March through December 2009. During this time, almost $1.2 million in investor money came in to DCS, but no transfers were made to Black Diamond. *Id.* at 183. During the same period, almost $5 million was taken in by all of the hedge funds for which Davey was serving as a hedge fund manager. *Id.* at 185. Nixon also testified that Davey spent almost $600,000 on building his personal residence during this timeframe. *Id.* at 186-87, 189-90, 192. According to Nixon, she used the term "Ponzi payments" on the exhibit to reflect new investor money being used to pay old investors. *Id.* at 187. Nixon also identified the total investor balance that was

---

[3] This exhibit is attached to the Government's original response. Civ. Doc. No. 4.

posted on Davey's website as having risen from just under $34 million in February 2009, to over $123 million by December of 2009. *Id.* at 200.

### D. Davey falsely characterizes $810,000 that he spent on building his mansion as a loan in order to evade paying taxes.

When Wymer prepared Davey's 2008 tax return, she characterized the $810,000 that DCS had loaned to Sovereign Grace, which in turn had loaned the money to Shiloh Estates, as a loan because this was how Davey had presented it in his books. Doc. No. 275, at 172. Accordingly to Wymer, she told Davey that his return did not seem right, as he should have been paying more taxes. *Id.* at 171-72.

Nixon reviewed Davey's 2008 tax return and found that he improperly characterized $810,000 as a loan to DCS. *Id.* at 205-06. Sovereign Grace borrowed the funds from DCS and then lent the money to Shiloh Estates, which used the money to build Davey's house. *Id.* at 168-69. However, the funds originated from Black Diamond, the company that Simmons had incorporated in North Carolina. *See* Gov. Exhs. 15a-15c; Doc. No. 276, at 48. Dixon, who was a contractor from Cary, North Carolina, testified that he had invested in DCS after Davey's brother told him about the fund. Doc. No. 274, at 112-13. Money that he invested in DCS was used to pay the architect and the builder for Davey's house. *Id.* at 121-23, 197-98. Because Davey took the $810,000 from investors and this amount was not a loan, he owed an additional $279,240 in taxes for 2008. Doc. No. 275, at 209-10.

When an investor questioned Davey about the $810,000 transfer to Sovereign Grace and whether any of that money could be recovered, Davey told him that the

12

$810,000 was a charitable endeavor from which no funds could be recovered. Doc. No. 274, at 11-15.

The jury convicted Davey of all four charges. Doc. No. 174. A probation officer prepared a presentence report, calculating Davey's total offense level as 47, which under the Sentencing Guidelines was capped at offense level 43. PSR ¶¶ 48, 51. With a criminal history category of I, the Sentencing Guidelines advised a sentence of 600 months of imprisonment, based on the statutory maximum sentences. PSR ¶¶ 56, 75. At sentencing, this Court granted certain of Davey's objections and determined that his total offense level was 42, which equated to a guidelines range of 360 months to life. Doc. No. 278, at 16–17 (Sent. Tr.). The Court then varied downward and sentenced Davey to 252 months of imprisonment, including 60 months of imprisonment for the tax count, 12 months of which was to run consecutively to the other counts. Doc. No. 263. The Court also ordered Davey to pay over $21 million in restitution. *Id.* In sentencing Davey, this Court noted that "[d]espite Mr. Davey's many other good qualities, he appeared to be driven by a greed that the Court rarely sees" and that his conduct was "unique" and "more heinous than the conduct of other conspirators." Sent. Tr. 60–61.

### E. On appeal, the Fourth Circuit finds "overwhelming evidence" that Davey and his co-conspirators intentionally misled investors in a variety of ways to obtain more money.

Davey appealed, arguing that this Court had erred in excluding the testimony of witnesses who would have testified that Davey refused to accept DCS investment money after August 2009, evidence relating to DCS investments other

than Black Diamond, and his 2009 tax return, which reported the 2008 "loan" as taxable income in 2009. *Davey*, 661 F. App'x at 243-45. He also argued that there was insufficient evidence to support his conviction for tax evasion and that the restitution order was invalid. *Id.* at 245-46. The Fourth Circuit rejected these arguments and found that "the government introduced at trial overwhelming evidence that [Davey] and his co-conspirators solicited funds by intentionally misleading investors, in multiple ways." *Id.* at 244. The Fourth Circuit issued its decision on September 8, 2016. *Id.* at 240.

Davey filed the present motion to vacate on September 13, 2017. Civ. Doc. No. 1, at 76 (Mot. to Vacate). The United States filed a timely response in November 2017. Civ. Doc. No. 4. In December 2017, Davey filed a reply. Civ. Doc. No. 6. In February 2018, he filed an amended reply. Civ. Doc. No. 8. Three months later, Davey filed a "supplement" to his reply, attempting to assert a new claim of prosecutorial misconduct. Civ. Doc. No. 9. Over six months later, Davey filed a second "supplement" attempting to add more claims of prosecutorial misconduct. Civ. Doc. No. 10. In March 2020, Davey filed a motion seeking discovery of an alleged audio recording from a pretrial proceeding. Civ. Doc. No. 11. The United States filed a response in opposition. Civ. Doc. No. 13. Davey then filed a reply and request for recusal. Civ. Doc. No. 14. In July 2020, Davey filed a third "supplemental" reply, again seeking to add additional claims of prosecutorial misconduct and also seeking discovery of information that he has requested from the Federal Bureau of Investigation pursuant to a Freedom of Information Act

request.  Civ. Doc. No. 15.  Later in July 2020, Davey filed a motion for emergency release.  Civ. Doc. No. 16.  On March 22, 2021, Davey filed a fourth addendum to his reply.  Civ. Doc. No. 17.  The United States now files this supplemental response to Davey's motion to vacate and numerous additional filings.

## ARGUMENT

Davey, through his motion to vacate and continuing filings, again attempts to shift blame for his actions to other people and entities.  He also attempts to shift the focus of the charges against him to whether he was involved in the Black Diamond Ponzi scheme.  In doing so, he ignores the actual basis of the charges against him, namely his misrepresentations to investors, including whether he performed due diligence on Black Diamond, and the derivative Ponzi scheme that he established, as well as the help that he provided to other fund managers to participate in the scheme, particularly after Black Diamond stopped paying out funds.  When properly focused, the baseless nature of Davey's claims is readily apparent.  Because Davey's claims of ineffective assistance and prosecutorial misconduct are without merit, his prosecutorial misconduct claims also are procedurally barred, and his new claims also are untimely, his motion to vacate should be denied.

When considering Davey's claims, this Court need not accept every kind of allegation contained in his motion.  *See Engleen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995).  It "need not assume the credibility of factual assertions, as it would in civil cases," for example, "where the assertions are contradicted by the record in the underlying proceeding."  *Puglisi v. United States*, 586 F.3d 209, 214 (2d Cir.

15

2009); *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). "Speculative allegations" are also insufficient. *Walton v. Johnson*, 440 F.3d 160, 178 (4th Cir. 2006). A 2255 motion "must contain assertions of fact that a petitioner is in a position to establish by competent evidence. Airy generalities, conclusory assertions and hearsay statements will not suffice." *Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007) (ellipses omitted) (quoting *United States v. Aiello*, 814 F.2d 109, 113 (2d Cir. 1987)). Here, Davey's claims are not supported by either the record or the law and, in large part, appear to be an attempt to present a theory of the case and extraneous facts that this Court determined were not admissible at trial.

## I. Davey's claims of ineffective assistance should be denied because he cannot show deficient performance or prejudice.

Under the Sixth Amendment, criminal defendants have the right to effective assistance of counsel. U.S. CONST. amend. VI. To prevail on a § 2255 claim of ineffective assistance of counsel, a petitioner has the burden of establishing both (1) that defense counsel's performance was deficient, in that counsel's "representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms," and (2) that this deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). Courts must apply a "highly deferential" standard in reviewing an attorney's performance and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. To establish prejudice, the petitioner must demonstrate there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

16

different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* It is not sufficient to show the mere "'possibility of prejudice.'" *Satcher v. Pruett,* 126 F.3d 561, 572 (4th Cir. 1997) (quoting *Murray v. Carrier,* 477 U.S. 478, 494 (1986)). In considering the prejudice prong, a court "can only grant relief under . . . *Strickland* if the 'result of the proceeding was fundamentally unfair or unreliable.'" *Sexton v. French,* 163 F.3d 874, 882 (4th Cir. 1998) (quoting *Lockhart v. Fretwell,* 506 U.S. 364, 369 (1993)). If a petitioner fails to conclusively demonstrate prejudice, the reviewing court need not consider whether counsel's performance was deficient. *United States v. Terry,* 366 F.3d 312, 315 (4th Cir. 2004).

### A. Appellate counsel was not ineffective for failing to argue for the first time on appeal that the civil freezing of DCS's assets violated Davey's Sixth Amendment rights.

Courts should ordinarily only find ineffective assistance for failure to raise claims on appeal when "ignored issues are clearly stronger than those presented." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (internal citation and quotation omitted). Appellate counsel is not required to assert all non-frivolous issues on appeal. *Griffin v. Aiken*, 775 F.2d 1226, 1235 (4th Cir. 1985). Rather, "it is the hallmark of effective appellate advocacy" to winnow out weaker arguments and to focus on more promising issues. *Smith v. Murray*, 477 U.S. 527, 536 (1986). Thus, "[a] decision with respect to an appeal is entitled to the same presumption that protects sound trial strategy." *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993). Additionally, the petitioner still bears the burden to show that there is a

reasonable probability that but for counsel's failure to raise an issue on appeal, the result of the proceeding would have been different, i.e., he would have prevailed on appeal. *See Robbins*, 528 U.S. at 285-86.

While Davey's appeal was pending, the Supreme Court decided *Luis v. United States*, 136 S. Ct. 1083 (2016), which addressed the use of a defendant's untainted property to pay reasonable attorney fees. In *Luis*, the defendant was charged with various offenses relating to healthcare fraud, including having fraudulently obtained almost $45 million. Because she had spent most of this money, the government sought to preserve the $2 million remaining in Luis's possession pursuant to 18 U.S.C. § 1345. *Id.* at 1087-88. The government moved for a pretrial order to restrain Luis from dissipating her assets, so that the assets could be preserved for paying restitution and other criminal penalties. *Id.* The government obtained an order freezing the assets on the basis that the assets were property of equivalent value, that is, the assets were untainted by the charged offense. *Id.* at 1087. The Supreme Court determined that the defendant had a Sixth Amendment right to use untainted funds "to pay a reasonable fee for the assistance of counsel." *Id.* at 1096.

Davey argues that his appellate counsel provided ineffective assistance by failing to argue, in light of *Luis*, that the freezing of his personal assets and the freezing of corporate assets without a hearing deprived him of his right to counsel in violation of the Sixth Amendment. Civ. Doc. No. 1, at 16-24 (Mot. to Vacate). He contends that he should have been allowed to hire counsel of his choice. Davey

18

refers, in particular, to DCS's allegedly untainted funds that he suggests were sent to Europe to invest in Amkel Corporation during September and October 2008. *Id.* at 17. Davey asserts that these funds "always retained their corporate title and that Davey never once claimed ownership of them." *Id.* He also contends that he should have been allowed to use any potential untainted future earnings to hire defense counsel. *Id.* at 24.

Davey cannot show that his appellate counsel's performance was deficient or that he was prejudiced. First, McVay did not represent Davey in the civil proceedings that froze his assets. Second, Davey admits that he did not own the DCS funds and that they "retained their corporate title." *Id.* at 17. Accordingly, he cannot show that any restraint of these corporate assets deprived him of the right to retain counsel on his personal behalf.[4] And he cannot seek relief for DCS under § 2255. *See* § 2255 (providing a remedy for prisoners "in custody under sentence of a court"). Third, Davey agreed to the freezing of assets as part of the Consent Order that this Court entered in the civil action. *See Simmons,* No. 3:11CV23, ECF. No. 73. Fourth, his bald assertion that the funds were untainted is false. The funds held by DCS in Europe also were tainted. *See* Gov. Exhs. 48a, 49b, 49c (showing diversion of funds from victim to DCS Euro and from DCS Euro to Shilo). Davey, himself, argued before the CFTC that DCS invested $4 million in Amkel in October

---

[4] In fact, Davey argued that the funds should be returned to DCS's shareholders. *Simmons*, No. 3:11CV23, ECF No. 81. The CFTC argued that the funds should be frozen because most of the money invested in Amkel by DCS came from Black Diamond. *Id.*, ECF. No. 88. This Court found that the funds should be frozen because they were part of DCS's assets and currently belonged to DCS, not its shareholders. *Id.*, ECF No. 90.

2008 and that over \$3.3 million of that money came from DCS's investment with Black Diamond. *Simmons*, No. 3:11CV23, ECF No. 81, at 4. Because the assets in a hedge fund are pooled, the funds are not separated, *see* Doc. No. 276, at 279-80, so any contention that the funds from DCS and Black Diamond were not tainted is without merit. There is "no right to use illegally obtained funds to hire an attorney." *United States v. Johnson*, 683 F. App'x 241, 250 (4th Cir. 2017), *cert. denied*, 2017 WL 2909214 (Nov. 6, 2017); *see Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 630-31 (1989) (rejecting the argument that the proceeds of a crime may be used to pay for an expensive defense). Accordingly, Davey cannot show deficient performance or prejudice because his assets were frozen in a separate, civil proceeding for which he retained separate counsel; DCS's assets did not belong to Davey personally; Davey had agreed to the restraint of these assets; and the assets were not untainted.

Davey also cannot show ineffective assistance of counsel on appeal based on his hypothetical contention that the civil restraining order prohibited him from obtaining employment in a new field and using his income for his defense without obtaining approval from the Court and the CFTC. Mot. to Vacate 23-24. Again, McVay did not represent him in the civil proceeding. Moreover, because he points to no new job, source of untainted income, or denial of a request to use funds for counsel, his contention is speculative and hypothetical. As such, this would not have presented an actual case or controversy, and counsel cannot be deficient for failing to raise a nonjusticiable issue. *See* U.S. Const. art. III; *Texas v. United*

*States*, 523 U.S. 296, 300 (1998) (holding "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all") (internal quotation and citation omitted); *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013). Because this is not a proper claim, Davey also cannot show prejudice.

Because Davey has not shown that there was a reasonable probability that he would have prevailed on appeal, particularly under the plain error standard, had his appellate counsel raised these claims, the claims should be dismissed. *See Robbins*, 528 U.S. at 285-86; *cf. United States v. Jones*, 844 F.3d 636, 639-42 (7th Cir. 2016) (holding, where defendant had not objected to pretrial financial restraint, that district court did not plainly err by entering the pretrial restraining order).

### B. Counsel was not ineffective for failing to challenge venue.

Pursuant to 18 U.S.C. § 3237(a), offenses committed against the United States that are committed in more than one district "may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." Tax evasion is a "continuing offense" within the meaning of § 3237(a). *United States v. Root*, 585 F.3d 145, 156 (3d Cir. 2009). In tax evasion cases, venue is not limited to the district of signing, filing, or preparation of the false tax return. *See United States v. Ohle*, 441 F. App'x 798, 801 (2d Cir. 2011) (holding "[a] tax evasion charge is properly venued wherever a defendant's attempt to evade taxes was begun, continued, or completed"). Venue is appropriate in any district where an attempt to evade took place. Thus, venue may be proper in the district in which

a false statement is made to an IRS agent, *United States v. Goodyear*, 649 F.2d 226, 228 (4th Cir. 1981), where the making of false records or the concealment of assets took place, *Beaty v. United States*, 213 F.2d 712, 715-17 (4th Cir. 1954), *vacated and remanded for reconsideration on other grounds*, 348 U.S. 905, (1955), *reaff'd*, 220 F.2d 681 (4th Cir. 1955), or where there was a concealment of assets, *Reynolds v. United States*, 225 F.2d 123, 127-28 (5th Cir. 1955).

Davey contends that counsel should have argued that venue for the tax evasion count was improper because the discussion, preparation, and filing of his tax return occurred in Ohio, and the property for which he used the loan is located in Ohio. Mot. to Vacate 48-52. He asserts that, as alleged, the charge against him was not a continuing offense. *Id.* at 50.

The Indictment properly alleged venue in the Western District of North Carolina, citing Simmons's transfer of Black Diamond funds from the Western District of North Carolina to Shiloh's account, as well as Davey's lying to IRS and FBI agents in the Western District of North Carolina. Indict. ¶¶ 123-24. Therefore, counsel had no basis for moving to dismiss the charge for lack of venue. There also was no basis for counsel to object at trial because adequate evidence of venue was presented since investments in DCS and Black Diamond were used to fund Davey's house—which he classified as a loan to avoid paying taxes on this money. *See* Gov. Exhs. 15a-15c; Doc. No. 275, at 168-69, 275; Doc. No. 276, at 48. Thus, Davey cannot show deficient performance. Davey also cannot show prejudice, because he cannot show that a challenge to venue was reasonably likely to succeed, nor can he

show that this ultimately would have changed the result, since he was guilty of the charge, and the charge could have been transferred to a district court in Ohio.

Davey falsely alleges that the tax evasion count charged in the Indictment involved both his 2008 and 2009 tax returns, Mot. to Vacate 52, despite the fact that the Indictment alleges that Davey attempted to evade the assessment of income tax due and owing "for the calendar year 2008," by "filing with the IRS a false 2008 U.S. Individual Income Tax Return." Indict. 23. Thus, his contention that counsel provided ineffective assistance by agreeing that the tax charge only related to his 2008 taxes is baseless. In fact, counsel attempted to question Wymer about Davey's 2009 tax return, but this Court ruled that the 2009 tax activity was not relevant. Doc. No. 275, at 178-80. Therefore, Davey cannot establish deficient performance or prejudice relating to the charge of tax evasion. *See Strickland*, 466 U.S. at 687-88, 694.

> ### C. Davey's assertion that counsel provided ineffective assistance based on the volume of discovery in the case should be dismissed as conclusory.

Davey asserts that counsel provided ineffective assistance because, due to the sheer volume of discovery, she could not have reviewed it all. Mot. to Vacate 25-26. However, Davey has not shown deficient performance or prejudice. Davey does not identify any documents that counsel should have used in his defense, but did not, nor does he identify any viable defense that counsel could have raised based on such documents. He relies solely on the number of hours that counsel billed, though this figure does not include the hours spent on the case by paralegals, experts, and other volunteers. *See* Civ. Doc. No. 1-2, at 88. Accordingly, this claim should be

dismissed as speculative and conclusory. *See United States v. Dyess*, 730 F.3d 354, 359-60 (4th Cir. 2013) (holding it was proper to dismiss § 2255 claims based on vague and conclusory allegations); *Day v. Quarterman*, 566 F.3d 527, 540-41 (5th Cir. 2009) (holding claim of prejudice should be dismissed as conclusory where petitioner did not demonstrate what counsel would have found in discovery, nor did she demonstrate that there was a reasonable probability that discovery of this information "would have altered the outcome at trial"); *cf. Beaver v. Thompson,* 93 F.3d 1186, 1195 (4th Cir.1996) (holding a petitioner must proffer specific information as to what the investigation would have produced).

### D. *Counsel's failure to move to admit evidence, which this Court had excluded, was not ineffective assistance.*

Davey argues that his attorney sought to introduce the full transcript of his 40-minute October 2009 conference call with other hedge fund managers, but then abandoned this effort after the Court asked her to provide the entire transcript for review. Mot. to Vacate 27-31. He alleges that if the jury had heard the entire call, there is a reasonable probability that it might have concluded that he lacked the fraudulent intent to establish his convictions for conspiracy. *Id.* at 31. He bases this on his continuing contention that "[t]he CFTC's failure to alert Davey and others about BD's fraud fostered the appearance of BD's legitimacy." *Id.* at 28.

Counsel was not deficient for failing to move again for admission of the entire 40-minute call. Davey concedes that the conference call "was replete with discussion about the CFTC investigations." Mot. to Vacate 57. This Court had excluded reference to the CFTC's investigation because it was irrelevant to Davey's

24

intent and actions. Doc. No. 274, at 61-62, 66-67. Additionally, this Court had held that Davey could not admit his own hearsay statements without establishing an exception and an evidentiary basis for their admission. Doc. No. 276, at 30-31. Davey has presented no basis or hearsay exception under which counsel might have sought admission of the entire conference call, nor has he made any showing that there is a reasonable probability that this Court would have admitted such evidence, or that this evidence would likely have changed the outcome of the trial. *See Strickland*, 466 U.S. at 694. Therefore, Davey has not shown deficient performance or prejudice based on counsel's failure to move to admit evidence that this Court had excluded.

Similarly, Davey's contention that counsel should have moved to admit CommunityONE Bank's Deferred Prosecution Agreement into evidence is misplaced.[5] *See* Mot. to Vacate 31. Again attempting to shift blame, Davey contends that this agreement could have been used to counter the allegation that Davey had not properly performed due diligence on Black Diamond because it showed that CommunityONE Bank had not notified Davey of Black Diamond's fraud.[6] *Id.* at 31-32. Any failure of another entity to notify Davey of Black Diamond's fraud was not relevant to whether Davey, himself, had misrepresented that he performed due diligence on Black Diamond, or had committed fraud by

---

[5] This assertion also contradicts Davey's contention that the Deferred Prosecution Agreement was never produced. And Davey can make no belated assertion that counsel was deficient for not obtaining this document because he argues that it would have been "completely unreasonable" for counsel to have searched for it. *See* Civ. Doc. No. 8, at 7.
[6] CommunityONE Bank admitted to not filing Suspicious Activity Reports. Such reports would not have gone to Davey.

accepting investment money and spending it, rather than investing it.  *Cf.* Doc. No. 274, at 66-67.  Accordingly, Davey has made no showing that such evidence was admissible, or that counsel's failure to move to admit such evidence prejudiced him. Therefore, Davey has not shown deficient performance or prejudice, and these claims of ineffective assistance of counsel should be dismissed.[7]  *See Strickland*, 466 U.S. at 687-88, 694.

E.  *Davey's assertion that counsel failed to adequately cross-examine Lacy is without merit.*

Counsel's strategic decisions regarding cross-examination of a witness were within the wide range of reasonable professional assistance.  Davey argues that his counsel should have objected when Lacy read an email that mentioned regulatory action; should have impeached Lacy's testimony that he did not know how Black Diamond's earnings appeared on Lacy's new website; and should have shown that the record established that Lacy took money in after Simmons was arrested.  Mot. to Vacate 32-35.  Davey also contends that counsel should have questioned Lacy regarding whether Davey was involved in the conspiracy.  *Id.* at 35.  Davey cannot overcome counsel's strategic decisions regarding examining the witness, *see*

---

[7] To the extent Davey attempts to extend the argument that counsel should have tried to introduce evidence of his efforts to conduct due diligence by calling bank officials or officers of Black Diamond, Mot. to Vacate 32, these claims should be dismissed as conclusory and, for the same reasons noted above, without merit.  *See Dyess*, 730 F.3d at 359-60; *see also United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (holding "[a] defendant cannot simply state that the testimony would have been favorable" because self-serving speculation is insufficient to establish ineffective assistance); *Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990).  Moreover, Davey's own testimony indicated that he considered diversification to be the best way to do due diligence.  *See* Doc. No. 276, at 129.

*Strickland*, 466 U.S. at 690-91, and the record establishes that counsel adequately cross-examined Lacy on all of these issues.

Davey's contention that counsel should have objected to Lacy's testimony that "if this gets taken to regulatory services, it will absolutely hit us all," and requested a mistrial is misplaced. Mot. to Vacate 33. Lacy's testimony did not violate the Court's exclusion of evidence regarding the CFTC investigation. This testimony reflected only Lacy's concern that unspecified regulators might become involved; it did not refer to an actual investigation or parallel proceeding. *See* Doc. No. 274, at 76.

On cross-examination, defense counsel was able to get Lacy to admit that after Simmons was arrested, Lacy created a new company and accepted new "investments." Doc. No. 274, at 107, 110. When setting up the website for the new company, Lacy took the numbers from Davey's website and duplicated them on the new website. *Id.* at 108-10. However, Davey was not involved with the new company. *Id.* at 110-11. Thus, counsel was able to draw out the information that Davey claims she failed to establish.

Lacy testified that, shortly after the February 2009 meeting where the fund managers were told that Black Diamond was going to do a cash out, he told Davey not to send any more money to Black Diamond because hedge fund managers had not received withdrawals from Black Diamond that they had requested. Doc. No. 274, at 44-46. After that point, Lacy continued to take funds but sent them to Davey, who put them in a liquid account and told Lacy that he could use that money

27

for whatever he wanted. *Id.* at 47, 87-90. The website that Davey maintained showed that the investments were making money, when in fact there were no earnings. *Id.* at 47. Given this testimony, counsel's strategic decision not to ask Lacy whether Davey was involved in the conspiracy was not deficient. *See Strickland*, 466 U.S. at 689-91. Nor can Davey show prejudice, where Lacy's testimony showed Davey's participation in the conspiracy.

Although Davey contends that counsel should have objected to the sufficiency of the evidence that a conspiracy existed, Mot. to Vacate 38, 46-47, counsel moved for a judgment of acquittal, but her motion was denied.[8] Doc. No. 275, at 225. Davey's assertion that there was no formal agreement between the alleged co-conspirators misapprehends the proof necessary to establish a conspiracy. Due to the "clandestine and covert" nature of conspiracies, there often is little direct evidence of an agreement to commit a criminal act. *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996). Therefore, circumstantial evidence may be used to establish a conspiracy. *Id.* at 858. And because the dates of the conspiracy are not elements of the offense, Davey's contention that a conspiracy was not shown during certain timeframes alleged in the Indictment also fails. *See United States v. Kimberlin*, 18 F.3d 1156, 1159 (4th Cir. 1994). Additionally, his contention that the government offered no evidence that Davey created bogus statements is meritless. *See, e.g.,* Doc. No. 274, at 135; Doc. No 275, at 200. Because there was ample

---

[8] Davey does not directly challenge the sufficiency of the evidence, and any such attempt would be procedurally barred because he only raised sufficiency of the evidence of the tax evasion count on appeal. *See Bousley v. United States*, 523 U.S. 614, 621-22 (1998). It also would lack merit.

evidence that Davey conspired to solicit funds by intentionally misleading investors, *see Davey*, 661 F. App'x at 244, Davey also cannot show prejudice.

Finally, Davey argues that McVay failed to offer evidence that he hired Norman Jones Enlow & Co. to conduct the hedge funds' annual audits in the summer of 2009 and that the auditors approved of his operation and found no evidence of fraud. *Id.* at 47. He contends that this evidence would have supported the argument that he was not involved in a conspiracy and that his "zero audits" were not fraudulent. *Id.* The exhibit Davey relies on for this conclusion, Pet'r's Exh. 10, shows that the auditors still had questions and were seeking additional information in November of 2009 for the 2008 audit that was being conducted. Thus, Davey has not shown that there was a clear audit that counsel could have introduced. Moreover, given that the bank statements and other records show that Black Diamond and DCS were not solvent in 2009 and that Davey was paying other investors and himself, rather than actually investing the funds entrusted to him, Davey cannot show that there is a reasonable probability that an audit report relating to 2008 would likely have changed the result at trial. Accordingly, Davey's claims of ineffective assistance should be denied.

## II. Davey's claims of prosecutorial misconduct should be dismissed as procedurally barred and without merit.

Through his claims of prosecutorial misconduct, Davey again seeks to inject issues outside the scope of the charges against him. Because Davey raises prosecutorial misconduct for the first time in this post-conviction proceeding, his

claims are procedurally barred.  His claims also lack merit because he can show neither improper conduct by the prosecution, nor prejudice.[9]

>    A.    *Davey procedurally defaulted his claims of prosecutorial misconduct by failing to raise them before this Court or on appeal.*

A § 2255 motion is not a substitute for a direct appeal.  *See United States v. Linder*, 552 F.3d 391, 397 (4th Cir. 2009).  Claims of errors that could have been raised before the trial court or on direct appeal, but were not, are procedurally barred unless the petitioner shows both cause for the default and actual prejudice, or demonstrates that he is actually innocent of the offense.  *See Bousley v. United States*, 523 U.S. 614, 621–22 (1998); *United States v. Bowman*, 267 F. App'x 296, 299 (4th Cir. 2008).  "[C]ause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel."  *United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1999).

To show actual prejudice, a petitioner must demonstrate that errors in the proceedings "worked to his *actual* and substantial disadvantage" and were of constitutional dimension.  *See United States v. Frady*, 456 U.S. 152, 170 (1982).  To show actual innocence, a petitioner must demonstrate that he "has been incarcerated for a crime he did not commit."  *United States v. Jones*, 758 F.3d 579, 584 (4th Cir. 2014), *cert. denied*, 135 U.S. 1467 (2015).  Actual innocence is based on

---

[9] As discussed below in issue III, Davey's attempt to raise new claims of prosecutorial misconduct in his supplemental filings are untimely, procedurally barred, and without merit.

Case 3:17-cv-00556-RJC   Document 19   Filed 03/30/21   Page 30 of 50

factual innocence and "is not satisfied by a showing that a petitioner is legally, but not factually, innocent." *See Mikalajunas*, 186 F.3d at 494.

Here, Davey concedes that he did not raise his present claims of prosecutorial misconduct on appeal. Mot. to Vacate 1. Despite raising numerous claims of ineffective assistance of trial and appellate counsel, he does not allege that counsel was ineffective for failing to raise these issues. Nor would such an allegation save his claims, because, as explained below, his assertions of prosecutorial misconduct are without merit. And Davey cannot show actual innocence, where the record establishes that the evidence against him was "overwhelming." *See Davey*, 661 F. App'x at 244.

> **B.** *Even if Davey could overcome the procedural bar, he has not shown improper conduct or prejudice.*

To establish prosecutorial misconduct, a defendant must demonstrate: (1) that the conduct of the prosecutor was improper, and (2) that the improper conduct prejudicially affected his substantial rights so as to deprive him of a fair trial. *See United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993). Even improper conduct may not affect substantial rights where the evidence of guilt is overwhelming. *See United States v. Williams*, 392 F. App'x 194, 196 (4th Cir. 2010).

> 1. <u>The government did not suppress evidence.</u>

Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), the Government has a duty to disclose favorable evidence, including impeachment evidence, that is material to guilt or punishment. "The mere possibility that an item of undisclosed information might have helped the

defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109-10 (1976). Evidence is material if it creates "a 'reasonable probability' of a different result." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). To establish a *Brady* claim, Davey bears the burden to show: (1) the evidence is favorable to him; (2) the prosecution suppressed the evidence; and (3) the evidence is material such that prejudice ensued, i.e., that there is a reasonable probability that the jury would not have convicted him had material evidence been disclosed. *See Fullwood v. Lee*, 290 F.3d 663, 685 (4th Cir. 2002); *Cone v. Bell*, 556 U.S. 449, 469-70 (2009).

Davey's suppression argument is baseless. He contends that the government "intentionally suppressed the full transcript of the October 2009 conference call." Mot. to Vacate 54. However, Davey is conflating suppression in violation of *Brady* with exclusion on evidentiary grounds. There was no suppression by the government because Davey recorded this call himself and defense counsel sought to have the entire 40-minute call introduced at trial. *See* Doc. No. 173; Doc. No. 172, at 10. "[I]nformation actually known by the defendant falls outside the ambit of the *Brady* rule." *United States v. Roane*, 378 F.3d 382, 402 (4th Cir. 2004). Thus, there was no *Brady* violation. Davey's issue is with the Court's decision to allow a portion of the call to be presented to the jury, which is an evidentiary decision that he is procedurally barred from challenging. *See* Doc. No. 274, at 58, 63, 66; *Bousley,* 523 U.S. at 621-22. And, in any event, his contention that the tape would have shown

32

that the co-conspirators did not know of Simmons's fraud misses the mark because, regardless of the fact that Black Diamond was a Ponzi scheme, Davey and his co-conspirators operated their own Ponzi schemes and defrauded investors by accepting investor funds, which they raided rather than invested.

Davey also asserts that the government failed to produce its deferred prosecution agreement with CommunityONE Bank.[10] Mot. to Vacate 74-75. He contends that this information would have been probative of whether Davey was aware of Simmons's fraud and that it was exculpatory information that should have been disclosed. *Id.*; Civ. Doc. No. 6; Civ. Doc. No. 8, at 1–9; Civ. Doc. No. 17. Davey's attempt to cast blame on another entity for not notifying him of Black Diamond's misconduct was not relevant to Davey's own conduct. *See* Doc. No. 274, at 65 (reliance on action or inaction by another entity was not relevant to show state of mind). And a suspicious activity report would not have gone to Davey anyway, but rather to regulators. Had the bank's actions been relevant, Davey could have argued that CommunityOne Bank did not raise any red flags as to the Black Diamond account—regardless of whether there was a deferred prosecution agreement. Accordingly, even assuming arguendo the truth of Davey's assertion,[11] this information was not material or exculpatory, and there is no reasonable probability that presenting it to the jury would have resulted in Davey's acquittal.

---

[10] As part of this agreement, CommunityONE Bank admitted to failing to maintain an effective anti-money laundering program as required by the Bank Secrecy Act and failing to file Suspicious Activity Reports relating to Simmons.

[11] Davey's assertion appears to contradict his contention that his attorney should have introduced the Deferred Prosecution Agreement, which would indicate that counsel had the agreement. *See* Mot. to Vacate 27.

Moreover, the fact of CommunityONE's Deferred Prosecution Agreement was public information. *See, e.g.,* https://www.hcpress.com/news/communityone-bank-agrgees-to-pay-400000-in-restitution-to-victims-of-simmons-ponzi-scheme-failed-to-detect-and-report.html (May 23, 2012 article); https://archives.fbi.gov/archives/charlotte/press-releases/2012/ponzi-scheme-mastermind-sentenced-to-50-years-in-prison (May 23, 2012 press release). The government does not violate *Brady* by failing to provide publicly available information to the defense. *See United States v. Infante*, 404 F.3d 376, 386-87 (5th Cir. 2005) (finding no *Brady* violation where case file of co-conspirator was a public record). It is well established that *Brady* does not apply to information or evidence available to a defendant from other sources, either directly or through diligent investigation. *See Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996); *Stockton v. Murray,* 41 F.3d 920, 927 (4th Cir. 1994); *United States v. Wilson,* 901 F.2d 378, 380-81 (4th Cir. 1990).

2. <u>The government did not present false or misleading evidence.</u>

The government has a duty not to solicit false testimony, nor to let such testimony go uncorrected. *See United States v. Bartko*, 728 F.3d 327, 335 (4th Cir. 2013). A new trial is warranted only when the admission of such testimony "could have affect[ed] the judgment of the jury." *Id.*

Davey's assertion that the government misled the Court regarding why Davey wanted to reference the CFTC investigation is misplaced. *See* Mot. to Vacate 55-58. The government presented the reasons that it believed that this information should not be admitted. *See* Doc. No. 131. In response, defense counsel explained

34

the reason she wanted to include the CFTC's investigation. Doc. No. 274, at 67.

The government's attempt to ensure that only relevant evidence was admitted at trial was not improper, nor did this prejudice Davey, particularly where Davey's reasons for wanting to admit this information were presented to the Court.

The government did not solicit testimony at odds with this Court's ruling regarding the parallel CFTC proceedings. Davey contends that the government violated the Court's ruling and intentionally misled the jury by questioning Lacy about the fact that no one had initiated a regulatory investigation. Mot. to Vacate 58. The prosecutor had Lacy read an August 4, 2009, email that he wrote to other hedge fund managers asking about what was happening with the paymaster for Black Diamond. Doc. No. 274, at 75-76. In the message, Lacy states "Any prudent person in our position would probably already be pounding on regulator's desks by now." *Id.* at 76. The prosecutor then followed up with Lacy, eliciting the fact that he did not pound on a regulator's desk because he knew that what he was doing was wrong. *Id.* This was not an inquiry into the CFTC's parallel investigation, rather this dealt with the co-conspirators' own actions, which indicated their knowledge that the investments were not solvent. Davey has not shown that it was improper for the prosecution to question whether Lacy knew that what he was doing was wrong.

Davey contends that the government proffered misleading testimony from Pultinas, who testified that Davey refused to answer questions regarding Safe Harbor. Mot. to Vacate 59-60. He contends that although this testimony "did not

establish guilt nor was it a link in a chain of events that led to the charged conduct, there was reasonable probability that [Pultinas's] testimony unduly inflamed the jury's passions against Davey." *Id.* at 60. The Court overruled Davey's motion in limine to exclude this evidence, holding that it was "highly probative" to "material matters." Doc. No. 274, at 10–11. Davey also complains that the government did not present additional evidence regarding the Ohio investigation. Mot. to Vacate 60. However, the Court had ordered the parties not to inquire regarding parallel proceedings, and the government sought to include Pultinas's testimony simply to show that Davey's refusal to answer questions was material to his knowledge and intent. Doc. No. 275, at 130. Davey's contention that the government misled the Court or the jury by not offering purported exculpatory evidence from the Ohio proceedings is baseless.[12] The evidence presented by the government was accurate, and Davey's contention that the government should have presented irrelevant information from a parallel proceeding misapprehends the prosecution's role and would have required the government to violate this Court's order limiting reference to parallel proceedings.

Davey also argues, citing his own beliefs and version of the events, that the government elicited false testimony from Wymer, Lacy, and Nixon. Mot. to Vacate 61-73. Wymer's testimony regarding the zero audit of St. Croix Partners, 1 LP,

---

[12] In 2010, Davey relinquished his securities license after the Ohio Division of Securities issued a notice of intent to suspend or revoke his license. *See* https://www.comapps.ohio. gov/secu/secu_apps/FinalOrders/Files/2010/10-072%20Davey%20Termination%20Order.pdf.

showed that, based on the document that Davey states he prepared himself, the audit was not accurate because St. Croix Partners, 1 LP, had millions of dollars more in assets than were reflected in the audit. Doc. No. 275, at 163-67, 174; Gov. Exh. 141b; *see* Mot. to Vacate 67. As Wymer testified, Davey told her that he was "babysitting" this money. Doc. No. 275, at 167. Accordingly, her testimony was accurate. Davey's assertion that a "false audit" only involves inflating assets, not undervaluing them, is without support. Civ. Doc. No. 8, at 12. Davey's contention that the prosecutor misled the jury during closing argument, by arguing that Davey falsely represented that Safe Harbor Wealth, Inc., was an independent accountant for the hedge funds that were administered by Safe Harbor Ventures, is meritless. *See* Mot. to Vacate 69; Doc. No. 277, at 21-22; *United States v. Manglitz*, 141 F.3d 1161 (4th Cir. 1998) (unpublished) (during closing argument a prosecutor may argue that the evidence supports an inference that may reasonably be drawn). Davey owned both entities and, as Lacy testified, the relationship was not independent. Doc. No. 274, at 73-74. Even Davey admits that he realized by 2009 he was not independent and hired another CPA firm to handle the audits. Mot. to Vacate 69.

Davey's assertion that Nixon's testimony and characterization of DCS distributions to shareholders as "Ponzi payments" was false because there was no evidence that Davey knew of Black Diamond's fraud also is meritless. *See* Mot. to Vacate 70. Nixon testified that between March 2009 and December 2009, Davey solicited investors for DCS, but none of the money received was invested or sent to

Black Diamond. Doc. No. 275, at 183 (Gov. Exh. 2c). She explained that the term "Ponzi payment" was used to characterize payments made "to old investors using money from new investors." *Id.* at 187. Because the distributions to shareholders were made from funds derived from other investors, rather than from investment earnings, this description was accurate.[13]

Davey asserts that, although his internal documents support Nixon's assessment of the actual values versus the reported values of DCS, there was no evidence that any investors saw these values, other than his own employees. Mot. to Vacate 71-72. Essentially, he contends that the total purported values of the individual investments were not posted on his website. *See id.* at 198-202; Civ. Doc. No. 8, at 9. Nixon testified that she used the information from the client database that Davey turned over to create Government's Exhibit 3b. Doc. No. 275, at 200-02. This exhibit summarized the relevant information, rather than purporting to be an actual page from Davey's website. *See* Mot. to Vacate exh. 30-9. And it identified the source of the information, which was Government exhibit 140. *Id.* Such use of summary evidence is proper. *See* Fed. R. Evid. 1006; *United States v. Strissel*, 920 F.3d 1162, 1163 (4th Cir. 1990) (affirming use of chart summaries to show gross profits). Davey's assertion that "no website actually existed," Civ. Doc. No. 8, at 9, is incorrect and counters his own testimony that he was "accounting for the funds and showing it on the website." Doc. No. 276, at 136-37, 140-41. And any

---

[13] Peripherally, Davey attempts, citing Pet'r's Exh. 29, to support his contention that the IRS approved of Safe Harbor Christian Foundation and that this discredits Nixon's trial exhibits. However, this exhibit merely shows that this foundation qualified for tax-exempt status, albeit with "certain deficiencies."

suggestion that investors did not make decisions based on the purported values posted on the website would be meritless, as Doggett testified that he used the website to check his earnings and that he invested more money based on the purported positive returns that the website reflected. Doc. No. 275, at 30-31, 34-35.

Davey maintained websites for a fee, and the statements that DCS posted relied on the bogus statements from Black Diamond. Doc. No. 274, at 41, 43, 47-48, 95-96, 204-05. Thus, DCS's statements, which relied on false information, also were false. And, even after Davey and the other managers stopped sending investors' money to Black Diamond, the websites posted purported returns for money that was being placed in cash accounts and spent. Accordingly, Davey's contention that the prosecutor's statement that the DCS website posted bogus statements was accurate. *See* Doc. No. 277, at 26; Doc. No. 274, at 47 (Lacy testified that "Davey would post those returns on the website, as though they were making that kind of money, when in all honesty they weren't making any money"). Because the government did not present false evidence, Davey's claims of prosecutorial misconduct based on the admission of such evidence, should be dismissed. *See Bartko*, 728 F.3d at 335.

## III. The Court should dismiss Davey's new claims as time barred, improperly raised, procedurally barred, and without merit.

Section 2255 provides for a one-year period of limitation. 28 U.S.C. § 2255(f). This time-period runs from the later of: (1) "the date on which the judgment of conviction became final," (2) the date on which an impediment to making a motion created by unconstitutional governmental action is removed if the action prevented the movant from making a motion; (3) the date on which certain new rights are

39

recognized by the Supreme Court and made retroactive on collateral review; or (4) "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(1)–(4). Davey's conviction became final on December 7, 2016, when the 90-day period for filing a petition for a writ of certiorari expired. *See Clay v. United States*, 537 U.S. 522, 532 (2003) (holding the limitations period begins to run when the time for seeking review expires). Although Davey filed his original motion to vacate within the one year limitations period, that is by December 7, 2017, all of his supplemental filings fall outside this one-year period. *See* Civ. Doc. Nos. 9, 10, 15, 17. Accordingly, any new claims in Davey's supplemental filings are untimely and should be dismissed.[14] *See Mayle v. Felix*, 545 U.S. 644 (2005) (recognizing timeliness of § 2255 claims is considered on a claim-by-claim basis).

Davey's new claims are not properly raised in a reply or supplemental reply. *See Doster v. United States*, 2021 WL 374974, at *3 (W.D.N.C. 2021) (holding new claims were not properly raised in a reply); *Sanders v. United States,* 373 U.S. 1, 18 (1963) ("Nothing in the traditions of habeas corpus requires the federal courts to tolerate needless piecemeal litigation ..."). Even if Davey had sought leave to amend his motion to vacate to add these new claims, such a motion would be futile because his new claims would not relate back to his original filing, they are

---

[14] Davey's new claims are focused on prosecutorial misconduct, which is addressed in this section. In light of the rambling and convoluted nature of Davey's submissions, as well as his many attempts to supplement his claims, however, to the extent that he touches on any other new allegations, such claims also should be dismissed as untimely and improperly raised.

procedurally barred, and they lack merit. Simply alleging prosecutorial misconduct in his motion to vacate does not grant Davey free license to add any prosecutorial misconduct claim he conceives of later. *See id.* at *4 (holding new ineffective assistance claim did not relate back to ineffective assistance claim originally alleged). The claims must arise out of "the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Even "[a]n amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, 545 U.S. at 650.

Davey's new claims of improperly suppressed evidence do not relate back to his original motion. Davey seeks to argue that the government failed to disclose: (1) a June 2009 subpoena from the Securities and Exchange Commission (SEC) to CommunityONE Bank requesting information on the Black Diamond account, Civ. Doc. No. 9; (2) publicly available cover sheets from his own case and the 2011 action against CommunityONE Bank, Civ. Doc. No. 10; (3) a December 2009 affidavit supporting a search warrant of Simmons; (4) a December 2009 affidavit in support of an arrest warrant for Simmons; (5) an April 2009 FBI memorandum seeking to open a full investigation against Davey; (6) a June 2009 FBI memorandum indicating that the FBI had spoken with the CFTC in May 2009; (7) a September 2009 memorandum from the FBI evidencing another conference call between the CFTC and the FBI; and (8) a July 2009 FBI 302 statement indicating that several

Black Diamond employees claimed to be "working on deals" and securing financing for customers, Civ. Doc. No. 15, at 1–4. None of these allegations arise from the same conduct set forth in Davey's original motion to vacate, namely his allegations that the prosecution suppressed the entire October 2009 conference call and the Deferred Prosecution Agreement for CommunityONE Bank. Mot. to Vacate 54, 74-75. Accordingly, these claims do not relate back to Davey's original motion and should be dismissed as untimely.

These new claims of prosecutorial misconduct also are subject to dismissal as procedurally barred by Davey's failure to raise them at trial or on appeal. *See Bousley*, 523 U.S. 614, 621–22. Davey has not shown cause or prejudice for failing to raise them, nor has he shown his actual innocence.

All of Davey's new claims of prosecutorial misconduct are based on evidence that is neither new, nor material, but rather goes to Davey's continuing attempts to try to shift the focus from his own deceptive actions. A June 2009 subpoena from the SEC to CommunityONE Bank requesting information on the Black Diamond account, Civ. Doc. No. 9, has no relevance to the actual issues in Davey's case and has no exculpatory value. Whether the SEC was investigating Black Diamond's accounts says nothing about the misrepresentations that Davey himself made to investors. Similarly, the cover sheets from his own case and the 2011 action against CommunityONE Bank, Civ. Doc. No. 10, which he suggests show that victims of Simmons's fraud did not receive notice of CommunityONE Bank's Deferred Prosecution Agreement, are public information and are unrelated to the issues

42

before the jury. Davey's suggestion that had the victims received such notice, he "would have had a different strategy at trial," should be dismissed as conclusory and without merit. *See Dyess*, 730 F.3d at 359-60. Any notice to victims in a separate proceeding involving different entities had no bearing on his own deceptive actions.

Likewise, the FBI documents that Davey cites, *see* Civ. Doc. No. 15, at 1–4, affidavits supporting warrants related to Simmons, the memorandum seeking to open a full investigation against Davey, memoranda showing the FBI had communicated with the CFTC, and a statement that appears to provide background information regarding different companies and indicates that Black Diamond employees claimed to be "working on deals" and securing financing for customers, *id.* at 19, are not material to Davey's conduct. Most of these documents relate to Simmons and the CFTC, rather than Davey. None of this evidence is material to the due diligence and derivative Ponzi scheme charges against Davey. Davey's suggestion that Simmon's statement is new, is incorrect. Davey previously cited Simmons's statement to the CFTC that Black Diamond was not trading foreign currency. Mot. to Vacate 10; *see* Civ. Doc. No. 1-1, at 1; Civ. Doc. No. 1-2, at 4; Doc. No. 276, at 55-56 (Simmons testified at trial that "Black Diamond did not invest any money in foreign currency."). And Davey himself admits that DCS did not deposit any more money with Black Diamond after February 2009, after he was informed that Black Diamond was going to do a cash out. Davey Aff. ¶ 56. The CFTC's actions were excluded because they were not relevant to the accusations against

Davey. Doc. No. 274, at 61. Finally, the statement that Black Diamond employees indicated that they were working on deals does not corroborate Davey's contention that two Vice Presidents of Black Diamond, Amanda Watson and David Davis, lied to him, about Black Diamond. Regardless, the relevant issue is not what Davey was told, but what he misrepresented to others. Because the documents Davey cites do not support a claim of prosecutorial misconduct under *Brady,* as they are neither exculpatory, nor material, and there is no reasonable probability that the outcome of the proceedings would have been different had these documents been disclosed,[15] these claims also should be dismissed for lack of merit. None of Davey's contentions undermine the fact that he received a fair trial.

## IV. Davey's motion for recusal should be denied as untimely and without merit.

The Court should deny Davey's motion, made almost two and a half years after filing his motion to vacate and numerous supplemental filings, for the Honorable Robert J. Conrad, Jr., to recuse himself. Civ. Doc. No. 14, at 2-3. The motion is untimely and without merit.

"A party introducing a motion to recuse carries a heavy burden of proof; a judge is presumed to be impartial and the party seeking disqualification bears the substantial burden of proving otherwise." *United States v. Oaks*, 606 F.3d 530, 537 (8th Cir. 2010) (quoting *Pope v. Fed. Express Corp.*, 974 F.2d 982, 985 (8th Cir. 1992)). "[V]ague, tenuous, or speculative" allegations do not meet that burden."

---

[15] This argument credits, *arguendo*, Davey's assertion that the documents were not disclosed.

*United States v. DeTemple*, 162 F.3d 279, 286 (4th Cir. 1998). The nature of the judge's bias must be personal and not judicial. *Shaw v. Martin,* 733 F.2d 304, 308 (4th Cir.1984). A judge is not disqualified by his familiarity with the facts of a case stemming from his judicial conduct in presiding over earlier proceedings. *United States v. Parker,* 742 F.2d 127, 128 (4th Cir.1984). "To prevent inefficiency and delay, motions to recuse must be filed at the first opportunity after discovery of the facts tending to prove disqualification." *United States v. Whorley*, 550 F.3d 326, 339 (4th Cir. 2008) (internal quotations and citation omitted).

Here, Davey bases his request for recusal and assertion of bias on the Judge's familiarity with the Black Diamond Ponzi scheme in light of having presided over related cases, an alleged statement by the Judge that is not reflected in the trial record, as well as the length of time for which his motion to vacate has been pending. Davey's motion for recusal is untimely, as it is based on two assertions he would have had knowledge of at the time of trial, and he did not raise this motion until more than two-and-a-half years after he filed his motion to vacate—which was well after his trial. *See Whorley*, 550 F.3d at 339. Davey also has shown no evidence of bias. He offers nothing more than speculation based on his disagreement with the Court's rulings, the Court's familiarity with the Black Diamond scheme, and the length of time his motion has been pending, but these are not extra-judicial bases for recusal. And the time for which Davey's motion has been pending is attributable to his having filed a 76-page motion, exhibits, and numerous supplemental documents and motions. Moreover, the hollowness of

Davey's claim of bias against him is effectively illustrated by the Court's decision to grant Davey a nine-year downward variance from 360 months to 252 months of imprisonment when sentencing him. Accordingly, the Court should deny the motion for recusal as untimely and without merit.

## V. Davey's motion for discovery should be denied.

Davey's request for this Court to order the FBI to produce "all the FBI records pertaining to himself and his criminal case for the years 2009 and 2010," Civ. Doc. No. 15, at 1, presents exactly the type of fishing expedition that courts have held is inappropriate. *See Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994) ("Rule 6 . . . does not authorize fishing expeditions."). Habeas and § 2255 proceedings were "never meant to be a fishing expedition for habeas petitioners 'to explore their case in search of its existence.'" *Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir. 1999) (quoting *Calderon v. U.S. Dist. Ct.*, 98 F.3d 1102, 1106 (9th Cir. 1996)). Unlike traditional civil litigants, habeas petitioners are not presumptively entitled to discovery. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *Rich*, 187 F.3d at 1068. Rather, Davey bears an appropriately high burden to obtain discovery in this post-conviction proceeding, as he stands duly convicted and sentenced—following proceedings before this Court and an appeal.

To obtain leave to serve discovery requests, Davey has the burden to show "good cause" under Rule 6(a) of the Rules Governing Section 2255 Proceedings. *See Bracy*, 520 U.S. at 908. "A habeas petitioner . . . is not entitled to discovery as a matter of ordinary course," but rather, is entitled to discovery only "'where specific

46

allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" *Id.* at 904, 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)); *see United States v. Roane*, 378 F.3d 382, 403 (4th Cir. 2004). Good cause does not exist where a petitioner requests discovery on a claim that fails as a matter of law. *Thomas v. Taylor*, 170 F.3d 466, 474 (4th Cir. 1999).

Rule 6(b) requires Davey to "specify any requested documents." R. Governing 2255 Proceedings 6(b). "Generalized" requests do not meet this requirement. *Teti v. Bender*, 507 F.3d 50, 60 (1st Cir. 2007). Davey has the burden to establish that the information he seeks "is material to the merits" of one of his claims. *See Stephens v. Branker*, 570 F.3d 198, 213 (4th Cir. 2009). "Discovery must relate solely to a specifically alleged factual dispute, not to a general allegation." *Clark v. Johnson*, 202 F.3d 760, 767 (5th Cir. 2000). That factual dispute must "result in [Davey] being entitled to habeas relief" if resolved in his favor. *Branker*, 570 F.3d at 213. And Davey must give this Court reason to believe that the discovery sought would resolve the dispute. *Id.*; *accord Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001) (affirming denial of discovery where "discovery sought by [the habeas petitioner] would not resolve any factual disputes that could entitle him to relief, even if the facts were found in his favor"). That is, he must show that the information sought would show that his constitutional rights were violated on a basis that he specifically raised in his motion to vacate.

This Court should deny Davey's request for discovery of "all the FBI records pertaining to himself and his criminal case for the years 2009 and 2010." Civ. Doc. No. 15, at 1. This request is overly broad and generalized, and he has not shown good cause for it. Davey cites no particular evidence that he is attempting to obtain, nor does he make any showing that would support a claim of constitutional error. And his request does not relate to a factual dispute regarding the only two *Brady* claims that he timely raised in his original motion to vacate. Accordingly, this Court should deny Davey's request for discovery.

## VI. An evidentiary hearing is not necessary to resolve Davey's claims.

In order to obtain an evidentiary hearing, a petitioner must present some evidence of a claim's merit. "Unsupported, conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing." *Nickerson v. Lee*, 971 F.2d 1125, 1136 (4th Cir. 1992), *overruled on other grounds by Gray v. Netherland*, 518 U.S. 152, 165-66 (1996). A petitioner also may not rely on assertions that are "contradicted by the record, inherently incredible, or [a conclusion] rather than [a] statement[] of fact," to obtain an evidentiary hearing. *Jackson v. United* States, 638 F. Supp. 2d 514, 528 (W.D.N.C. 2009) (internal quotations and citation omitted). Here, Davey's self-serving affidavit and arguments are contradicted by the record. And his claims fail as a matter of law. Accordingly, an evidentiary hearing is not necessary to resolve his claims.

## VII. Davey is not entitled to release pending determination of his claims.

Although courts have the power to grant bail pending a decision in a § 2255 case, that power should be exercised "very sparingly." *Cherek v. United States*, 767 F.2d 335, 337 (7th Cir. 1985). Here, Davey's claims are without merit. Accordingly, he cannot meet his burden to show substantial constitutional claims on which he has "a high probability of success" and "exceptional circumstances" rendering a grant of bail necessary for the § 2255 remedy to be effective. *United States v. Eliely*, 276 F. App'x 270 (4th Cir. 2008). Therefore, the Court should deny Davey's motion for release.[16] Civ. Doc. No. 16.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court dismiss or deny Davey's motions.

RESPECTFULLY SUBMITTED this 30th day of March, 2021.

WILLIAM T. STETZER
ACTING UNITED STATES ATTORNEY

s/Elizabeth M. Greenough
Elizabeth M. Greenough, N.Y. Bar No. 2667905
Assistant United States Attorney
227 West Trade Street, Suite 1650
Charlotte, NC 28202
Telephone: 704-344-6222
Fax: 704-344-6229
Email: Elizabeth.Greenough@usdoj.gov

---

[16] The Court denied Davey's motion for compassionate release in his criminal case without prejudice. Crim. Doc. No. 310.

49

**CERTIFICATE OF SERVICE**

I certify that I caused to be served a copy of the above response upon the Petitioner by U.S. Mail at the following address:

Jonathan D. Davey
27328-058
FORT DIX Federal Correctional Institution
Inmate Mail/Parcels
P.O. BOX 2000
Joint Base MDL, NJ 08640

This 30th day of March, 2021.

s/Elizabeth M. Greenough
Assistant United States Attorney
USAO Charlotte, NC